UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                          Case No. 8:24-cr-00068-KKM-TGW

TIMOTHY BURKE

**UNITED STATES' REPLY TO BURKE'S RESPONSES**

The United States submits this reply to Burke's responses[1] in opposition to the United States' motion for protective order. Docs. 33, 39, and 51.

**I.   Introduction**

On February 15, 2024, a Middle District of Florida grand jury found probable cause and returned an indictment charging Burke with conspiracy and related substantive violations of the Computer Fraud and Abuse Act (18 U.S.C. §§ 1030(a)(2)(C) and the Wiretap Act (18 U.S.C. § 2511(a) and (c)). Doc. 1. The charged conspiracy alleges, in part, that Burke and Gaudino utilized a set of compromised credentials to repeatedly access without authorization a StreamCo-Net password-protected website from which they systematically obtained and stole information, including non-guessable[2] "StreamCo-Net BIDs [device identification

---

[1] For clarity, Burke's responses are referred to as Response #1 (Doc. 39) and Response #2 (Doc. 51).

[2] Per Count One, Section A, ¶¶ 9-11, each StreamCo device had an assigned unique identifier, referred to in the indictment as a BID, that was algorithmically generated and ranged from 9 to 15 characters. Thus, assuming knowledge that the StreamCo-assigned algorithmically generated BIDs ranged from 9 to 15 characters, the approximate odds of randomly guessing a valid BID would be 1 in 999,999,900,000,000.

numbers] and other proprietary information." The stolen StreamCo BIDs and proprietary information revealed the components and structure of valid StreamCo-Net preview feeds, which conspirators exploited to illegally intercept wire communications transmitted across the StreamCo-Net by its broadcaster-customers.

As explained below, Burke's responses in opposition are without merit, in that the arguments raised are premised upon mischaracterizations of the charged conduct and case facts and supported with unanalogous legal authority. Consistent with Rule 16(d)(1) and the Crime Victims' Rights Act, the proposed protective order will enable the defense to possess a forensically sound copy of Burke's system and other discoverable materials while maintaining necessary safeguards over discoverable items that contain PII, intellectual property of others, and/or contraband.

## II. Applicable Law Governing Charged Conduct

### A. Violations of the Computer Fraud and Abuse Act ("CFAA")

The elements of a violation of 18 U.S.C. § 1030(a)(2)(C) are that: (1) the defendant intentionally accessed a computer without authorization; (2) when the defendant accessed the computer, the defendant obtained information therefrom; and (3) the computer accessed was a protected computer.[3] When considering terms under the CFAA, the Eleventh Circuit noted that, as with any question of statutory interpretation, a court should begin by examining the statute's text to determine whether it is clear and, if so, a plain reading of that text should control. *Brown Jordan*

---

[3] *See* Eleventh Circuit Jury Instructions (Criminal), Instruction O42.2 (modified).

*International, Inc. v. Carmicle*, 846 F.3d 1167, 1173 (11th Cir. 2017). In that light, the Fourth Circuit explained in *WEC Carolina Energy Solutions LLC v. Miller*, 687 F.3d 199, 204 (4th Cir. 2012):

> The CFAA is concerned with the unauthorized access of protected computers. Thus, we note at the outset that 'access' means '[t]o obtain, acquire,' or '[t]o gain admission to.' Oxford English Dictionary (3d ed.2011; online version 2012). Moreover, per the CFAA, a 'computer' is a high-speed processing device 'and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.' § 1030(e)(1). A computer becomes a 'protected computer' when it 'is used in or affecting interstate or foreign commerce.' § 1030(e)(2).

As to "without authorization," the Fourth Circuit continued: "the CFAA does not define 'authorization.' Nevertheless, the Oxford English Dictionary defines 'authorization' as 'formal warrant, or sanction.'" *Id*. at 204. The Second Circuit, citing to the Ninth Circuit in *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1133 (9th Cir. 2009), has employed a like analysis:

> The critical term—'authorization'—is not defined in the statute, but we have previously recognized in construing the CFAA that 'authorization' is a word 'of common usage, without any technical or ambiguous meaning.' *United States v. Morris*, 928 F.2d 504, 511 (2d Cir.1991). The dictionary defines 'authorization' as 'permission or power granted by authority.' Random House Unabridged Dictionary 139 (2001). Thus, common usage of 'authorization' suggests that one 'accesses a computer without authorization' if he accesses a computer without permission to do so at all.

*U.S. v. Valle*, 807 F.3d 508, 524 (2nd Cir. 2015). A grant of permission to use a password to access a protected computer is therefore a necessary step in securing authorization to do so, and merely having the ability to access a computer does not equate to authorization. Thus, access gained by guessing another entity's password does not equate to authorized access under the CFAA. *See, e.g.*, *Morris*, 928 F.2d at

3

510. As reasoned by a district court in *Vox Marketing Group v. Prodigy Promos*, 556 F.Supp.3d 1280, 1287 (D.Utah 2021), in reviewing a scenario in which a defendant company had experimented with a competitor's website until the defendant company gained insight into how to access and obtain information from that website:

> "Defendants' knowledge seems comparable to that of someone who learns that the locking mechanism of a physical door does not securely engage when the door is locked and shut, and that the door can thus be opened by rattling the handle or the door itself until the lock disengages. And just as one who knowingly goes through a locked door in such a manner is no more authorized to enter than someone who picks a lock, the court believes that a reasonable jury could find that Defendant was no more authorized to obtain access to the [information] by knowingly exploiting a defect in Vox's password protection that it would have been to obtain access to these proposals by hacking a password."

Finally, mere observation of data is enough to "obtain information" in violation of the CFAA: "[a]ctual asportation, in the sense of physically removing the data from its original location or transcribing the data, need not be proved in order to establish a violation of [the relevant] subsection."[4]

### B. Violations of the Wiretap Act

In the Eleventh Circuit, the elements of a violation of § 2511(1)(a) are that: (1) the defendant intentionally intercepted, or endeavored or procured another to intercept; (2) the contents of a wire, oral, or electronic communication; (3) the defendant did so by use of a device; and (4) the interception of the communication was contemporaneous with the transmission of the communication. 18 U.S.C.

---

[4] *See* S. Rep. 99-432, at 6-7 (1986), *reprinted in* 1986 U.S.C.C.A.N. 2479, 2484; *see also* Eleventh Circuit Jury Instructions (Criminal), Instruction O42.2, Annotations and Comments.

§ 2511(1)(a); *and see United States v. Turk*, 526 F.2d 654, 658 (5th Cir. 1976); and *see United States v. Steiger*, 318 F.3d 1039, 1047-50 (11th Cir. 2003). A defendant is deemed to have intercepted a communication upon acquisition; it is not necessary that defendant also review the communication. *See Sanders v. Robert Bosch Corp.*, 38 F.3d 736, 740 (4th Cir. 1994) ("recording of a telephone conversation alone constitutes an 'aural . . . acquisition' of that conversation"); *Walden v. City of Providence*, 495 F.Supp. 2nd 245, 262 (D.R.I. 2007) (citing cases).

A defendant's claim that his purposes in illegally intercepting communications were noble because the interceptions were part of a personal investigation into crime or maleficence are irrelevant to mental state. *See Gelbard v. United States,* 408 U.S. 41, 50 (1972) ("Virtually all concede that the use of wiretapping or electronic surveillance techniques by private unauthorized hands has little justification where communications are intercepted without the consent of one of the participants."); *United States v. Townsend,* 987 F.2d 927, 931 (2nd Cir. 1993) ("whether the defendant had a good or evil purpose in utilizing the automatic recording equipment is, therefore, irrelevant").[5]

### III. Burke's Response #1 Mischaracterizes Prior Exchanges with the United States and the Proposed Protective Order.

Burke's Response #1 wrongly claims that the United States is "unilaterally" designating discovery materials as protected and thereby restricting "the use of this

---

[5] *See* S. Rep. No. 99-541, at 24 ("[P]eople who steal because they like to or to get more money or to feed the poor, like Robin Hood, all commit the same crime …. The word 'intentional' describes the mental attitude associated with an act that is being done on purpose.").

information by the defense." Doc. 39 at 1. The United States filed its motion for protective order, Doc. 33, only after the United States had proactively engaged in good-faith efforts to fully inform the Burke defense team about the available discoverable materials in this case and had made all discoverable materials available to the defense team for its inspection and review.

The United States hosted the defense team for a Rule 16.1 Pretrial Discovery Conference and followed that meeting with a discovery letter and an "Attachment A" that described the available discoverable materials and specified those items (with Bates numbering) identified as containing personal identifying information ("PII"), intellectual property of others, and/or contraband (hereinafter, "Covered Materials").[6] Relevant here, the United States explained in its discovery letter that: (1) the Covered Materials were available for the defense team's inspection and review at the Tampa FBI office, and (2) the United States remained open to working cooperatively to reach an agreed-upon procedure by which the defense team could have possession and access to the Covered Materials.[7] The United States then submitted a proposed protective order to the defense that would have permitted the defense to have ***full access to all Covered Materials (including those identified as contraband)*** for its investigation and trial preparation, subject only to reasonable,

---

[6] A copy of the "Attachment A" to the discovery letter and other exhibits will be submitted to this Court with an appropriate exhibit list under a motion to seal for the Court's review *in camera*.

[7] A copy of the United States' letter is available for this Court's review should the Court so desire.

6

victim-centered restrictions against reproduction or dissemination and a requirement that Burke—*charged with unauthorized computer intrusions and theft of the materials, and with unlawful interceptions and disclosure of same*—not have unsupervised access to the materials. That proposal was rejected without the defense even reviewing the designated Covered Materials or engaging in any other inquiry or discussions.

IV. **Burke's Response #1 Includes Erroneous Claims About the "Covered Materials" to be Protected and Burke's Status.**

In Response #1, the defense claim that the United States "seeks a protective order limiting the use and/or disclosure of broad swaths of information," much of which Burke, "as a journalist, . . . collected over decades of reporting" is also demonstrably false. Doc. 39 at 2. Following the May 2023 execution of a search warrant at Burke's residence, the United States returned to him any devices seized that only contained information falling outside the authority to seize under the relevant warrants,[8] and eliminated any images of those devices in its systems. As to seized devices that contained a mix of information falling inside and outside the authority to seize, the United States produced to Burke copies of all folders/files contained in the devices, withholding only those folders/files that fall within the authority to seize that constitute contraband or fruits of the identified crimes.[9] Thus,

---

[8] The original warrant to search Burke's residence permitted the United States to search for and seize evidence relating to violations of 18 U.S.C. §§ 1030 and 2511, involving Burke and occurring after August 1, 2022. *See Tampa Bay Publishing Company v. United States of America* (Case No. 8:23-mc-00014-WFJ-SPF, the "TBT Case"), TBT Case, Doc. 18-1. The August 1 date was extended forward to February 20, 2022, via a follow-on warrant.

[9] This process was periodically reported to the Court in the TBT Case. *See, e.g.*, TBT Case, Docs. 37, 37-1, 40, 40-1, 47, 47-1, 49, and 49-1.

the investigative team has returned to Burke *all information seized from his residence that predates February 20, 2022*, and has only retained for its use information authorized to be seized by the pertinent warrants.

Further, Burke's claim that he collected the information now designated by the United States as "contraband"—*i.e.*, digital property unlawfully obtained and stolen by Burke in violation of 18 U.S.C. §§ 1030 and/or 2511, during the period charged from February 2022 to May 8, 2023—via his ongoing work as a "journalist" is inconsistent with how Burke himself described his work during that period. Burke's resume, published by him in May 2023 on his ilovecitr.us website, reflects that Burke had previously worked for the Gizmodo Media Group and The Daily Beast from 2011 through 2019. Thereafter, however, Burke had self-categorized himself as a consultant, describing his work on his burke-communications.com website as concerning "Social/Political/Media Consulting," and stating on his ilovecitr.us website that he was a "media + political communications consultant, broadcast monitor, archival technologist, and viral content visionary." *See* Attachment 1 (Burke's published resume and website screenshots).

In any event, Burke's oft-repeated claim is a red herring. As discussed below, regardless of how Burke now categorizes his work ("journalist" or "consultant"),[10]

---

[10] The Burke defense team's repeated use of the terms "journalist" and "newsroom" to describe Burke and his workspace suggests a misguided strategy deployed to tilt Department of Justice policies and other authorities in his favor. Indeed, some facts and arguments raised in the TBT Case and here read as if they were crafted working backwards from Department policies to fabricate suggested wrongdoing by the United States and additional (nonexistent) protections for Burke.

8

Burke is not immune from investigation and prosecution if, as found by the grand jury and charged in this case, **Burke obtained information or items through his own criminal acts**, **in violation of 18 U.S.C. §§ 1030 and 2511**. As recognized by the Supreme Court, it would be "frivolous" to assert—much less hold—that a reporter or his sources would have a "license . . . to violate valid criminal laws." *Branzburg v. Hayes*, 408 U.S. 665, 691 (1972). And Burke has not cited any statue or other authority to support the proposition that a federal criminal defendant who possesses contraband or fruits of his own criminal acts is entitled to possess and use that contraband to the detriment of his victims. There is none.

**V.    Burke's Response #2 is Premised Upon Baseless Mischaracterizations and Unanalogous Law in an Effort to Recast and Cloud the Charged Case.**

Burke's Response #2 includes a collection of baseless (false) assertions that mischaracterize the contents of the indictment and the underlying facts in an apparent effort to recast the charged case to one Burke desires to defend, that being a civil case in which the United States is seeking to enjoin Burke from publishing materials legally possessed.[11] For example, Response #2, at page 6, states that the charges in the indictment relate to "unproven allegations that a source for Mr. Burke directed him to an archived public website of WGNS Radio, where the radio station

---

[11] Response #2 is peppered with assertions and arguments relevant only to unanalogous civil cases involving injunctions sought against members of the news media and others. *See, e.g.*, Doc. 51 ("government seeks to enjoin Mr. Burke, an award-winning journalist, from using, disseminating, or publishing his own work product" (p. 2); "This case is at the core about journalism" (p. 3); "crime charged is finding and reporting on information . . . allegedly without permission" (p. 3); "Burke is a journalist who is accused of 'downloading information without consent'" (p. 6).)

9

*had published a link to its live feeds.*" That is baseless and mischaracterizes the charged conduct. Instead, the indictment alleges that conspirators Gaudino—who has pleaded guilty to the conduct, *see* Attachment 2—and Burke exchanged direct messages during which Gaudino provided Burke with credentials to access the StreamCo-Net computer, without having been authorized by either the credential holder or StreamCo to use those credentials or to access that computer.[12] Burke's reference to an archived public website of a radio station is another red herring.

Response #2 also ignores material aspects of the charged conduct that do not fit neatly into Burke's defense of the recast case. For example, the indictment charges that conspirators Burke and Gaudino secured and used compromised credentials that enabled access to an NSL FTP server, from which the conspirators obtained and stole information.[13] Response #2 makes only a glancing mention of those unlawful intrusions and thefts, focusing substantially all of Burke's argument on the allegations relating to the interceptions and thefts of only a few (of the more than 1000) livestreams found on Burke's computer. The United States anticipates that, as charged, its trial evidence will show that Burke repeatedly accessed that NSL FTP server and downloaded to his computer (stole) copies of files residing on that

---

[12] *See* Doc. 1, Count One, ¶ 23.d. Response #2 includes additional baseless representations of the charged case including: (1) "The fact is—even according to the Indictment—the live streams were unencrypted, and configured to be readily accessible to the public." (p. 11); and (2) that the StreamCo-Net password-protected website "automatically downloaded to [Burke's] computer a list of both CBS and other live video streams, including a list of public, unencrypted streams of Fox News." (p. 6). These (and other) inaccurate representations ignore the actual charged conduct.

[13] *See* Doc. 1 at Count One, ¶¶ 5-7, 22, 23.a.-23.c., and Count Two and Three.

server, many of which contain nothing more than historical sports footage owned by the NSL. *See* Attachment 3, redacted NSL system logs revealing Burke's download activity on two sample days (7 files downloaded February 21, 2022; 71 files downloaded September 14, 2022). That Response #2 ignores that aspect of the allegations is likely not an oversight but rather a recognition by the defense that the conduct reflects heartland unlawful computer intrusion and theft.

To support Burke's argument against a protective order, Response #2 cites to the unanalogous landmark cases *New York Times Company v. United States*, 91 S.Ct. 2140 (1971), and *Bartnicki v. Vopper*, 121 S.Ct. 1753 (2001), and to other civil cases for the proposition that a potential publisher in receipt or possession of information of public importance cannot be enjoined from publication of that information, absent the party seeking that injunction making certain showings. *See, e.g.*, Doc. 51 at 4-5 and 11-12. But those cases are not applicable here. The potential publishers in receipt or possession of information in the cases cited in Response #2 had not been directly involved in any illegal conduct to secure the information.

Indeed, in *Bartnicki*, the Supreme Court specifically noted that, in *New York Times v. United States*, it had previously "upheld the right of the press to publish information of great public concern obtained from documents ***stolen by a third party***." *Bartnicki*, 121 S.Ct. at 1761 (emphasis added). The Supreme Court then clarified the issue presented by *Bartnicki*: "Where the punished publisher of information has obtained [it] ***in a manner lawful in itself*** but from a source who has

11

obtained it unlawfully, may the government punish [subsequent] publication of that information based on the defect in a chain?" *Id*. at 1762 (emphasis added). Response #2 then attempts to improperly stretch *Bartnicki* to capture Burke's situation—***a federal criminal defendant charged with violations of the CFAA and the Wiretap Act who desires to possess and use the fruits and contraband of his criminal conduct***—by citing to a district court decision in *Democratic National Committee v. Russian Federation*, 392 F.Supp.3d 410 (2019), erroneously suggesting that the court there extended *Bartnicki* to "provide a First Amendment right to publish information even when the publisher was in 'active collaboration' with the person who allegedly stole the information." Doc. 51 at n.38. In *Democratic National Committee*, however, the court specifically noted that the publisher of the information had not solicited the theft, "but [instead made] a request for material that had been stolen." *Democratic National Committee*, 392 F.Supp. at 435-436. As a result, the DNC "[could not] hold the [publishing] defendants liable for the publication of [the information]." *Id*. These and other cases concerning the appropriateness of an injunction in a civil case to halt publication of information by a potential publisher that had not been directly involved in any illegal conduct to secure the information are inapplicable and irrelevant here.

Following Burke's argument, it would be lawful for Person #1, having unlawfully secured a list of Victim's website passwords from Person #2, to use Victim's passwords without the knowledge and authorization of Victim to access Victim's online accounts and computer and thereby monitor Victim's bank account

12

transactions, health records, and personal computer contents (and camera), and to then copy and save any information deemed desirable to Person #1's own computer system for later distribution, so long as Person #1 claims the conduct was engaged in as a journalist. Of course, such a proposition is absurd.

## VI. PII, Intellectual Property,[14] and Contraband.

### A. The PII

Per the motion for protective order, Doc. 33, the United States secured PII and other related information about third parties and others whose presence was detected in certain online platform logs only by IP address to identify said individuals and to determine whether those individuals were accessing a particular platform at a particular time with or without authorization. Examples will be submitted *in camera* as Ex. 2. That information falls under Fed. R. Crim. P. 49.1 and other related rules and policies. The United States also secured information from Victim Entities that includes sensitive, non-public customer account information to determine the reach and impact of the charged criminal conduct.

### B. The NSL Covered Materials

As detailed in Count One, Section D (Overt Acts), Burke and Gaudino exchanged direct messages in February 2022 via Twitter during which Gaudino provided Burke with (administrative level) credentials that enabled Burke to

---

[14] 18 U.S.C. § 1835 (Orders to Preserve Confidentiality) specifically anticipates the need for protective orders in cases involving the theft of trade secrets. While this case does not charge a violation of 18 U.S.C. Chapter 90, such considerations are pertinent by analogy to the requested protective order.

repeatedly access without authorization an NSL FTP server. Pursuant to search warrants, the United States located contraband—approximately 3,079 folders/files—on Burke's computer system that was downloaded by Burke from that NSL FTP server following his use of the compromised NSL credential. To establish Burke's unlawful access and download activity, the United States secured from Victim-Entity NSL electronically produced logs of activity on its computer network. Said logs contain intellectual property and are considered confidential, in that they contain non-public proprietary information such as IP addresses, "ports" or communication channels accessible within related networks, names of other computers potentially on the NSL network, usernames with privileges on that network, and various computer identification numbers used as part of authentication processes. Such information, if published, could provide nefarious actors with knowledge that potentially could be used to undermine that network.

Thus, while the United States does not oppose the defense having full access to the relevant information to investigate and prepare for trial, Burke—*charged for his unauthorized access of the NSL server and with stealing the designated contraband*—should be prevented from directly accessing the contraband folders/files and the intellectual property absent supervision by the defense team to prevent public dissemination of these materials. An excerpt from the NSL server logs and a slide excerpted from one video file (of over 3000) downloaded from the NSL FTP server found on Burke's computer system will be submitted as the Ex. 3 Series to the Court for its review *in camera*.

      C.      <u>The StreamCo-Net Covered Materials</u>

The United States found on Burke's computer system StreamCo-Net related contraband, namely the stolen BIDs and related information, as well as approximately 1,073 files that contain all or part of apparent intercepted and stolen wire communication streams of StreamCo-Net broadcaster-customers. As part of the investigation, the United States secured from StreamCo intellectual property concerning its internal business and computer system design processes and customer-account information, including electronically produced system logs and Excel crosswalk worksheets that tie the StreamCo-Net decoders (identified by assigned BIDs) to particular customers, allowing the investigative team to associate stolen intercepted streams with the proper Victim-Entities. Said logs contain personal identifying information (names, usernames, passwords) and other StreamCo proprietary information (system BIDs, IP addresses, customer information). Correspondence from StreamCo counsel, excerpts from the StreamCo logs, a StreamCo BID-customer crosswalk, and exemplar video streams from two files (of over 1000) found on Burke's computer system will be submitted as the Ex. 4 Series.

      Wherefore, for all of the above reasons, the United States requests that this Court enter the proposed protective order, which will enable the Burke team to investigate and prepare for trial while maintaining appropriate safeguards necessary to protect Victim Entities and other third parties.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

By: /s/ Jay G. Trezevant
Jay G. Trezevant
Assistant United States Attorney
Florida Bar No. 0802093
400 N. Tampa St., Suite 3200
Tampa, Florida 33602-4798
Telephone: (813) 274-6000 Email: jay.trezevant@usdoj.gov

/s/ Adam J. Duso
Adam J. Duso
Assistant United States Attorney
Florida Bar No. 1026003
400 N. Tampa St., Suite 3200
Tampa, Florida 33602-4798
Telephone: (813) 274-6000 Email: adam.duso@usdoj.gov

U.S. v. TIMOTHY BURKE          CASE NO. 8:24-cr-00068-KKM-TGW

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to counsel for the Defendant.

                                      */s/Jay G. Trezevant*
                                      Jay G. Trezevant
                                      Assistant United States Attorney