UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>TIMOTHY BURKE | Case No. 8:24-cr-68-KKM-TGU |

**DEFENDANT TIMOTHY BURKE'S RESPONSE**
**REGARDING THE USE OF "CONTRABAND"**

1. On June 27, 2024, the Court ordered the parties (Doc. 56) to respond to the government's specific request for a protective order prohibiting Mr. Burke from having unfettered access to, or make certain uses of "contraband or the fruits of crimes," specifically including the live video feeds he allegedly downloaded from servers used by Fox News Corporation (not named in the Indictment) and from an FTP site used by the NBA (similarly not named). [1] The government proposes (Doc 33-1, par 1) that the Court order, *inter alia*, "that defense counsel is prohibited from allowing defendant unsupervised access" to the discovery

---

[1] The Court directed the parties to specifically address the issue of "contraband." However, the government includes within its definition of "contraband" copyrighted materials, trade secrets, or Personally Identifiable Information ("PII"). Again, the government has not designated specific files or documents or why they believe them to be protectable under F.R. Crim. P. 16(d)(1), and absent such a designation on a file by file basis, we cannot have a meaningful discussion of potential harm and balancing required by the rule.

materials, but does not suggest the nature of the "supervision" defense counsel are to be ordered to provide to the accused.

2. The proposed protective order would permit the government to designate certain information it is returning to Mr. Burke - which was in Mr. Burke's possession, custody or control prior to the execution of the search warrant -- as "contraband" or "fruits of a crime" and therefore return this information to him only upon an agreement that he access it only in the presence of counsel, and/or that he not publish, disseminate or use this information because of the government's designation.

3. At the outset, we note that the government has not specified which precise information, documents, records, files, videos, or other information it has seized and proposes to return to Mr. Burke that it wishes to have covered by the proposed protective order as "contraband." There is no inventory, list, or designation of specific files it considers to be "contraband" and the specific reason the government considers this to be contraband for each individual file. In fact, none of the materials the government seeks to "protect" are, in fact, "contraband" and none were obtained unlawfully. In addition, the burden at this stage is on the government to present evidence that the materials it seeks to restrict are both contraband and that disclosure would cause the kind of harm that would require a prior restraint on speech - a burden which would require the presentation of evidence.

4. In order to obtain a Protective Order under F.R. Crim. P. 16(d)(1), the government must demonstrate "good cause" for the order.

> Of course, district courts should only grant protective orders upon a showing of good cause. See *United States v. Luchko*, 2006 WL 3060985, at *3 (E.D. Pa. 2006) (citing Fed. R. Crim. P. 16(d)(1); *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994)). Such " '[g]ood cause is established on a showing that disclosure will work a clearly defined and serious injury to the party seeking closure.' " *Pansy*, 23 F.3d at 786 (quoting *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1071 (3d Cir. 1984)); *see also Auto-Owners Ins. Co. v. Southeast Floating Docks, Inc.*, 231 F.R.D. 426, 429-30 (M.D. Fla. 2005) (same) (citing *United States v. Garrett*, 571 F.2d 1323, 1326 n.3 (5th Cir. 1978)). Because the injury must be demonstrated with specificity, " '[b]road allegations of harm, unsubstantiated by specific examples or articulated reasoning,' do not support a good cause showing." *Pansy*, 23 F.3d at 786 (quoting *Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1121 (3d Cir. 1986)); *see also United States v. Gangi*, 1998 WL 226196, at *2 (S.D.N.Y. 1998) (holding that a protective order may only be entered upon a demonstration of a particular factual showing of potential harm to witnesses).

*United States v. Belfast*, No. 06-20758-CR, 2007 WL 9705938, at *2 (S.D. Fla. Apr. 26, 2007). *Accord, United States v. Bulger*, 283 F.R.D. 46, 52 (D. Mass. 2012). No such showing has been attempted here.

5. In the context of discovery generally, and particularly in the return of items seized from the accused, the government must show some *specific harm* resulting from the potential use by the accused of the returned items, and must *balance that harm* against the Constitutional restrictions on the right to effective assistance of counsel and the right to prepare a defense, as well as the First

3

Amendment rights of the accused as a journalist to disseminate information. See, e.g., *Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984). No specific harm has been shown here, and on balance, there is no compelling need to protect the information that the accused had prior to government intervention.

6. The government has lumped together different categories of information as one -- "contraband" (materials which are illegal to possess), "fruits" of a crime - materials that were derived from activities the government proposes to demonstrate were violations of federal criminal law, and "instrumentalities" of a crime - data, files, information or other materials that were used to facilitate some criminal offense. The government lumps all of these into a single category of "contraband," but they are not. This is why the government must specify which files they seek to enjoin, and the specific reason and category for the protection sought.[2]

7. We assume that the "crime" for which the government seeks to assert that the files are "fruits or instrumentalities" are the offenses in the Indictment which relate to a journalist "downloading information without authorization" (even though this is specifically NOT a crime under *Van Buren v. United States*, 593 U.S. 374 (2021)). The proposed protective order places the cart before the horse, presuming that materials are criminally derived before there is any showing by

---

[2] Finally, the government may be seeking to enjoin the dissemination of "mere evidence" and restrict Mr. Burke's access to materials which, under Rule 16, the law presumes he should have unfettered access to. Indeed, the Rule presumes access to all discovery, and the government seeks an order abrogating that rule.

the government of any crime, and before there is any designation of specific files or information sought to be protected.

8. We also note how unusual it is for the government to refer to "information" as "contraband." The term is generally applied to physical property in general, and to things that are unlawful to possess like child pornography, seized weapons, or illegal narcotics. With respect to certain classes of information relating to national security, foreign relations, and certain provisions of the Atomic Energy Act, certain classified information may be illegal to possess by persons without the appropriate level of security clearance. *United States v. Trump*, No. 23-80101-CR, 2023 WL 7172026, at *5 (S.D. Fla. Nov. 1, 2023). The government has not asserted that Burke's possession of information violates 18 USC 793(e), or that the distribution of this information will cause "grave harm" to the national security. The government merely asserts that he holds information without permission. Even in the area of stolen "property" the term is not generally applied to inchoate property like "information."[3]

9. The problem is exacerbated where, as here, the information is held by a journalist. The govt has not limited its request to any specific information by identifying or citing to the specific information that they allege was obtained without authorization and is therefore now alleged to be "contraband." They

---

[3] As noted in our initial brief, this is not a case where the government seeks to prevent a journalist from publishing newsworthy information because that information is subject to copyright, where the use of the information would likely fit squarely in the "fair use" exemption of copyright law, a principle expressed many times by Fox News itself.

have elected to seek a wholesale Protective Order on the entirety of Mr. Burke's archives, and they demand that Burke identify any particular items he intends to use and seek the govt's approval and endorsement of their use....or, suffer the government's refusal to permit their use. That is a classic prior restraint under the First Amendment.

10. In short, treating information *per se* as "stolen property" and publication as use of contraband which needs to be restrained is the classic "prior restraint" on publication warned against by the Supreme Court. Indeed, the classic Supreme Court case on prior restraint on speech was *New York Times v. United States*, 403 U.S. 713 (1971) -- the Pentagon Papers case, the information was both alleged to have been stolen, and the reporters alleged to have possessed or copied the information unlawfully. In a 6-3 decision, the high court famously ruled that, despite the fact that the information was both classified and "stolen," [4] the newspaper was free to publish and disseminate the information free from prior restraint.[5] The government threatened to prosecute both the New York

---

[4] Indeed, in dissent, Chief Justice Burger noted "to me it is hardly believable that a newspaper long regarded as a great institution in American life would fail to perform one of the basic and simple duties of every citizen with respect to the discovery or possession of stolen property or secret government documents.That duty, I had thought—perhaps naively—was to report forthwith, to responsible public officers. This duty rests on taxi drivers, Justices, and the New York Times." *Id,* 403 U.S. at 751.

[5] The court held that "Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity.' *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963); see also *Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931). The Government 'thus carries a heavy burden of showing justification for the imposition of such a restraint.' *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971)." *Id.,* 403 U.S. at 714.

Times and Neil Sheehan, the Times reporter, [6] and criminally investigated the Washington Post and Ben Bagdikian, the Post reporter who also received and published the purloined documents. [7] The Supreme Court held that the stolen documents could be published and that the First Amendment permitted publication irrespective of whether they were classified or stolen.

11. The Government calls the live feeds "contraband" <u>not because there is anything inherently unlawful about these live video feeds,</u> but because the government asserts that the grand jury (and before that, Magistrate Judge Flynn) found probable cause to believe that Mr. Burke "intercepted" [8] these live feeds without the consent of Fox News Corporation (unnamed) or Tucker Carlson or

---

[6] As New York Times Supreme Court reporter Adam Liptak noted "According to a 1975 memoir by Whitney North Seymour Jr., who was the U.S. attorney in Manhattan in the early 1970s, *Richard G. Kleindienst, a deputy attorney general, suggested convening a grand jury in New York to consider criminal charges against The Times*. Mr. Seymour said he refused. A grand jury was then convened in Boston, but it did not issue an indictment." Adam Liptak, The Pentagon Papers, A First Amendment Case That Made an 'Incoherent State of the Law' The New York Times, Published June 9, 202, Updated June 14, 2021 available at https://www.nytimes.com/2021/06/09/us/supreme-court-pentagon-papers-prior-restraint.html. See also, Janny Scott, Now It Can Be Told: How Neil Sheehan Got the Pentagon Papers, The New York Times, Published Jan. 7, 2021 Updated Jan. 9, 202, available at https://www.nytimes.com/2021/01/07/us/pentagon-papers-neil-sheehan.html. Sheehan recounted that he met with lawyers for the New York Times, they advised him that he likely committed a felony. Id. Indeed, "Sheehan smuggled the papers out of the apartment in Cambridge, Mass., where Mr. Ellsberg had stashed them; then he copied them illicitly, just as Mr. Ellsberg had done, and took them to The Times."

[7] Seth Rosenfeld, The FBI's secret investigation of Ben Bagdikian and the Pentagon Papers, Columbia Journalism Review, August 29, 2018 available at https://www.cjr.org/investigation/ben-bagdikian-pentagon-papers.php

[8] The term "intercepted" is somewhat confusing as used in the statute. It is defined in 18 USC 2510(4) as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" Essentially, listening in or copying a communication using a device. Under this definition, *watching live television news is using a device to acquire the contents of a communication in transmission.* This is why the law requires the government to prove that the communication is not "readily accessible to the public."

7

Kanye West, among others. *Consent or not, this does not make these feeds "contraband."* The Indictment alleges that Burke and his alleged co-conspirator used a computer to download communications from the StreamCo [LiveU] server, but *omit a critical fact* -- the web server from which these live feeds were alleged to have been downloaded was, in fact, "configured to be readily accessible to the public" [9] and therefore, accessing them and viewing the contents - which only required a web browser and a web address -- did not violate the wiretap law. [10]

12. The government calls these web addresses (BID's) "secret" (Indictment, Par. 10-11) and asserts that "the StreamCo net was designed to limit access to only authorized customers" by requiring a userid and password. **Even if this is true, it is not a violation of the wiretap statute, and the live feeds are not "contraband."** No userid or password was required to access the live feeds themselves - they were "in the clear." As one court noted, "The question is not, however, whether *the networks* are "readily accessible to the general public," but

---

[9] 18 U.S.C. § 2511(2)(g)(i)  "It shall not be unlawful under this chapter or chapter 121 of this title for any person--(i) to intercept or access an electronic communication made through an electronic communication system that is configured so that such electronic communication is readily accessible to the general public."

[10] In its initial motion (Doc. 33, p. 3) the government notes "the indictment alleges that Burke and Gaudino stole information from StreamCo-Net,... via a secure password-protected website, used that stolen information to unlawfully intercept the contents of video communications as they were being transmitted…" It is important to parse this sentence. The Indictment alleges that Burke and Gaudino obtained the BID web addresses for the live streams from a secure password-protected website, and NOT that the streams themselves were secured or password protected. This is precisely the distinction made by the Court in *Innovatio IP Ventures*. The streams were readily accessible to the public.

8

instead whether the network is configured in such a way so that <u>the electronic communications sent over the network are readily accessible</u>." *In re Innovatio IP Ventures, LLC Pat. Litig.*, 886 F. Supp. 2d 888, 892 (N.D. Ill. 2012)(emphasis added). In this case, even though the government asserts that the https://matrix.liveu.tv website required at least a demonstration password to access, *THE LIVE FEEDS THEMSELVES did not*, and the LiveU.tv server was configured so that the electronic communications (the live feeds) sent over the network were readily accessible to anyone - even if the addresses themselves were obscure. In *Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1321 (11th Cir. 2006)[11] the Court warned against attempting to criminalize simply finding things on the Internet which were "readily accessible" even if hidden, and even if, as in the *Snow* case, *expressly prohibited* noting:

> Through the World Wide Web, individuals can easily and readily access websites hosted throughout the world. Given the Web's ubiquitous and public nature, it becomes increasingly important in cases concerning electronic communications

---

[11] See also, *Trump v. Clinton*, 626 F. Supp. 3d 1264, 1317 (S.D. Fla. 2022)("Plaintiff does not dispute the public nature of this data, and it would appear difficult to maintain an SCA claim based on public internet data); *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1200 (2022) ("Congress wanted to protect electronic communications that are configured to be private;" *MCGIP, LLC v. Does 1-14*, No. 11 C 2887, 2011 WL 13552528, at *3 (N.D. Ill. July 26, 2011)(intercepting communications through a BitTorrent site is lawful because "it appears that such file sharing is readily accessible to the general public, and accordingly is not protected under the ECPA"). *Jones v. Carranza,* No. 3:22-CV-00494-ART-CSD, 2023 WL 11830748, at *5 (D. Nev. Aug. 17, 2023)(police monitoring social media posts regarding a suspect involved in burglaries lawful because sites "configured such that the electronic communication is readily accessible to the general public."); *Louis Vuitton Malletier, S.A. v. Akanoc Sols.*, Inc., No. C 07-03952 JW, 2008 WL 3200822, at *1 (N.D. Cal. Aug. 7, 2008)(citing *Snow*, 18 USC 2511 "does not "criminalize or create civil liability for acts of individuals who 'intercept' or 'access' communications that are otherwise readily accessible by the general public.")

9

> available through the Web for a plaintiff to demonstrate that those communications are not readily accessible. If by simply clicking a hypertext link, *after ignoring an express warning*, on an otherwise publicly accessible webpage, one is liable under the SCA, then the floodgates of litigation would open and the merely curious would be prosecuted. We find no intent by Congress to so permit. Thus, the requirement that the electronic communication not be readily accessible by the general public is material and essential to recovery under the SCA.

13. Put simply, downloading unencrypted, publicly accessible, live video feeds from an obscure Internet address does not violate the statute, and the feeds themselves do not become "contraband." As former DOJ Computer Crime prosecutor Orin S. Kerr, noted in Norms of Computer Trespass, 116 Colum. L. Rev. 1143, 1164–65 (2016) "A hard-to-guess URL is still a URL, and the information posted at that address is still posted and accessible to the world." The live streams were publicly accessible, (even if their addresses were not publicized), and they are not "contraband." They were freely downloaded from an open and public server whose address may have been obscure. There was no "hacking" or "interception" - just putting an address in a browser, like in *Snow*. As such, the files are not "contraband," and the government cannot meet its burden of showing that they are and that their dissemination should be restricted.

14. The same thing is true for the data allegedly obtained by accessing the File Transfer Protocol (FTP) server for NSL - the euphemism the government is using

for the National Basketball Association, an organization that contains teams with whom Mr. Burke has worked as a subcontractor in the areas of video procurement and analysis.

15. While the government has not identified what specific information it alleges was obtained from the NBA FTP site and why it believes this information is "contraband," from the Indictment we have attempted to glean insight into at least some of these files. As this Court noted in the hearing, it appears that the "contraband" the government seeks to restrain from discovery consist of short (and old) clips of videos of NBA action that the NBA made available to sports journalists and include things like:

- A four minute video of highlights of the 1990 NBA Finals between the Detroit Pistons and the Portland Trail Blazers; [12]
- Video of Michael Jordan's game-winning shot against the Utah Jazz in Game 6 of the 1998 NBA Playoffs.[13]
- A two minute video of Chicago Bulls 1991 playoff highlights.[14]
- A three minute video of highlights from the 1980 NBA Finals.[15]

16. These short clips do not become "contraband" simply upon an assertion that they were accessed using published credentials. If they did, then the proposed order would require counsel to prohibit Mr. Burke from unsupervised viewing or disseminating these clips even if he downloaded them from YouTube, TikTok and Facebook respectively through the links provided.

---

[12] Available at YouTube at https://www.youtube.com/watch?v=wL3mTaIukQo
[13] Available at TikTok at https://www.tiktok.com/@jordanlastsecondshots/
[14] Available at Facebook at https://www.facebook.com/watch/?v=238507273888012
[15] Available at YouTube at https://www.youtube.com/watch?v=MeGy8sWHltw

Viewing a movie on Netflix with someone else's account does not make that movie "contraband." Even if the materials were allegedly downloaded without permission, the government must still demonstrate that a prior restraint on publication or dissemination is necessary to prevent a specific harm to obtain the relief contemplated by F.R. Crim. P. 16(d)(1). Indeed, it is precisely what the government seeks to designate here as "contraband" the files and records the government will later seek to introduce at the criminal trial under F.R. Evid. 401. Thus, the government will likely seek to introduce at trial the very files it claims here cannot be lawfully accessed by the Defendant.

17. The proposed Protective Order, without designating specific files as contraband which is unlawful to possess -- is not designed to prevent specific harm to specific entities, but to obtain a strategic advantage at trial.

Respectfully submitted,


Michael P. Maddux, Esquire
Florida Bar # 964212
Michael P. Maddux, P.A.
2102 West Cleveland Street
Tampa, Florida 32606
Phone: (813) 253-3363
Fax: (813) 253-2553


Mark D. Rasch
Law Office of Mark Rasch
Member, MD, MA, NY Bar
MDRasch@gmail.com
(301) 547-6925
Admitted *Pro hac vice*


COUNSEL FOR TIMOTHY BURKE

CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that on this 9th day of July 2024, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system.

                                          *s/Michael P. Maddux*
                                          Michael P. Maddux, Esquire