UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                        Case No. 8:24-cr-00068-KKM-TGW

TIMOTHY BURKE

**<u>UNITED STATES' OPPOSITION TO BURKE'S MOTION TO SUPPRESS</u>**

The United States opposes Burke's motion, Doc. 65, that requests this Court suppress the evidence seized pursuant to a warrant executed at Burke's residence and, relatedly, order a *Franks* hearing. As explained below, Burke's motion is founded upon baseless allegations of material misrepresentations and claimed omissions that are either flatly untrue, turn out not to be misrepresented or omitted from the affidavit, or are irrelevant to a probable-cause finding. Moreover, even if Burke's allegations were correct, which they are not, suppression would not be a permissible remedy. Burke's motion also fails to show any *Franks* violations, much less the required "substantial preliminary showing" to justify his request for a hearing, making that request wholly deficient. The motion should be denied.

## I.   Introduction

In May 2023, a federal magistrate judge, upon consideration of a supporting affidavit, Ex. 1, found probable cause and issued a warrant to search Burke's residence for records and evidence relating to violations of 18 U.S.C. §§ 1030 (the Computer Fraud and Abuse Act ("CFAA")) and 2511 (the Wiretap Act). FBI agents

executed that warrant at Burke's residence on May 8, 2023. In the secondary suite behind the primary residence, the agents located a workspace that contained more than an estimated 100 items that qualified as either a computer or storage medium, as described in Attachment B to the warrant. The search team left with only approximately two dozen electronic devices and a few hard copy items, listed in the return filed with the Court. *See* Case No. 8:23-mc-00014-WFJ-SPF, Doc. 18-1 at 28-29. One of the items initially seized was a computer apparently being utilized by Burke's spouse, a Tampa City councilperson. As with all electronic items seized, a forensic image was made of that computer. However, that computer was returned, through counsel, to Burke's spouse, and the forensic image was removed from government systems prior to undergoing any search.

Preceding the search of the residence, procedures/protocols were developed regarding how the searching agents were to handle any material encountered potentially categorized as: (1) attorney-client communications or attorney work-product; (2) political work-related material; and/or (3) "work product materials" or "documentary materials," as defined under the Privacy Protection Act ("PPA"). *See* 42 U.S.C. § 2000aa, *et seq.* A member of the search team was designated to act as a filter-team agent if such materials were encountered, and an AUSA not part of the investigative team was identified to coordinate with that agent if needed.

As noted in the United States' initial discovery letter,[1] the United States

---

[1] Said letter explained that the use of the filer review process resulted in the investigative team having access to only a subset of the total amount of material that would be made available to the defense.

employed a filter review process for, among other material, the items seized from Burke's residence that fell within the date parameters established by the warrant to appropriately safeguard potentially privileged/protected material and shield same from the investigative team. That filter process was in addition to precautionary measures taken prior to executing the warrant. Following that date-restricted review, the United States returned to Burke any electronic items that fell outside the parameters of the warrant or had no evidentiary value and eliminated any images of those items from government systems. The United States also returned the seized hard copy items without making and retaining any copies. Finally, the United States produced to Burke copies of the folders/files contained on the remaining items, except those identified as contraband or fruits of the crime.

## II.   Applicable Law When Considering a Motion to Suppress

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend IV. "[P]robable cause exists 'if facts within the magistrate's knowledge and of which he had reasonably trustworthy information would warrant a man of reasonable caution in the belief that a crime was committed and that evidence is at the place to be searched.'" *United States v. Betancourt*, 734 F.2d 750, 754 (11th Cir. 1984) (quoting *United States v. Strauss*, 678 F.2d 886, 892 (11th Cir. 1982)).

"The issuing magistrate is to make a 'practical, common-sense decision' about whether the 'totality of the circumstances' indicate that there is probable cause that

the sought-for evidence will be obtained." *United States v. Nixon*, 918 F.2d 895, 900 (11th Cir. 1990) (quoting *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983)). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232. The affidavit only needs to show that the degree of suspicion attached to particular conduct is sufficient to support a finding of probable cause; it need not determine whether particular conduct is "guilty." *United States v. Mathis*, 767 F.3d 1264, 1276 (11th Cir. 2014). "The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978); *see also Haire v. Thomas*, 219 F. App'x 844, 846 (11th Cir. 2006) ("To issue the warrant the magistrate judge had to determine only that there was a 'fair probability' that [a person] has evidence in his home relating to the underlying fraud. The evidence did not necessarily have to implicate [that person] in the crime.").

Reasonable inferences of the affiant can be used by the magistrate judge as one part of his overall determination of probable cause so long as he is not following the "mere hunch" of another. *See Massachusetts v. Upton*, 466 U.S. 727, 734 (1984). Law enforcement officers routinely include in affidavits opinions and conclusions drawn from their experience and training, and a magistrate judge may properly make use of that information in the probable-cause determination. *See United States v. Robinson*, 62 F.3d 1325, 1331 n.9 (11th Cir. 1995).

4

"Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." *United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994). "And the duty of the reviewing court is simply to ensure that the magistrate had a substantial basis for . . . concluding that probable cause existed." *Gates*, 462 U.S. at 238-239 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)). "A magistrate's decision that probable cause exists is conclusive absent arbitrariness." *Betancourt*, 734 F.2d at 754. "[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's determination of probable cause should be paid great deference by reviewing courts." *Gates*, 462 U.S. at 236 (quotation marks omitted).

A warrant "need only describe the place to be searched with sufficient particularity to direct the searcher, to confine his examination to the place described, and to advise those being searched of his authority." *United States v. Weinstein*, 762 F.2d 1522, 1532 (11th Cir. 1985) (quotation marks omitted). And a warrant describes things to be seized with sufficient particularity "when it enables the searcher to reasonably ascertain and identify the things authorized to be seized." *Betancourt*, 734 F.2d at 754-55. Neither "elaborate specificity" nor "technical perfection" is necessary. *United States v. Bradley*, 644 F.3d 1213, 1259 (11th Cir. 2011). "It is universally recognized that the particularity requirement must be applied with a

5

practical margin of flexibility, depending on the type of property to be seized" and the nature of the investigation. *United States v. Wuagneux*, 683 F.2d 1343, 1348-49 (11th Cir. 1982). "Cloud or data-based warrants with a sufficiently tailored time-based limitation can undermine any claim that they are the internet-era version of a general warrant." *United States v. McCall*, 84 F.4th 1317, 1328 (11th Cir. 2023) (quoting *United States v. Blake*, 868 F.3d 960, 974 (11th Cir. 2017)). Insufficient particularity in a warrant can lead to suppression only when the warrant is "so facially deficient," that "the executing officers cannot reasonably presume it to be valid." *United States v. Leon*, 468 U.S. 897, 923 (1984); *see Blake*, 868 F.3d at 974-75 (warrant lacked particularity but good-faith exception foreclosed suppression).

When a defendant seeks suppression based on a claim that the warrant affidavit failed to establish probable cause, suppression is warranted only if the "warrant is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *McCall*, 84 F.4th at 1325 (quotation marks omitted). "To exclude evidence on this ground, the affidavit must be so clearly insufficient that it provided no hint as to why police believed they would find incriminating evidence." *Id.* (quotation marks omitted). The "officer's judgment must be more than just mistaken—it must be so plainly incompetent that no officer of reasonable competence would have requested the warrant." *Id.* (quotation marks omitted). The "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known

that the search was illegal in light of all of the circumstances," not the "subjective intent" of the searcher. *Herring v. United States*, 555 U.S. 135, 145-46 (2009).

## III.   The Probable Cause Affidavit

The application for the warrant was accompanied by a detailed affidavit from an experienced FBI special agent. Ex. 1 ¶ 1. The affidavit identified Burke's residence as the "Target Location," and listed the "Target Offenses" under investigation as 18 U.S.C. §§ 1030 (CFAA) and 2511 (the Wiretap Act). *Id.* at ¶¶ 2-3. The affidavit then provided the below facts and conclusions. *Id.* at ¶ 4.

The investigation was referred to the FBI by "Law Firm #1," representing a broadcast network, identified as "NetworkCo," to report an unlawful intrusion incident, which had occurred on October 6, 2022. *Id.* at ¶ 22. The affidavit specified that the identities of victims and others had been anonymized to protect their privacy and the investigation. *Id.* at n.1. The anonymizations were supplemented with ample details,[2] permitting the magistrate judge to appreciate the contents of the affidavit in making the probable-cause determination. Thus, the identifier "Host" was described as a "program host" for a broadcast network's news arm, "NetworkCo News," who had interviewed a "Celebrity" on October 6, 2022, in Los Angeles. *Id.* at ¶¶ 22-23.

As that October 6 interview was being recorded, it was being transmitted using encrypted and proprietary software over the Internet to NetworkCo servers in New

---

[2] The additional detailed information provided for context included, among other information, event dates, email address, IP addresses, Twitter address, phone numbers, identity of primary actor (Burke), detailed description of conduct involved, positions held by interview subjects.

York City by "StreamCo," a company hired to provide live video technology services. *Id*. NetworkCo News broadcast portions of that interview during programs airing on October 6 and 7, 2022. *Id*. On October 11, a different media company's website, "WebPub," published online six links to excerpts from that interview, together with the article, "Watch the Disturbing [Celebrity] Interview Clips That [NetworkCo News Host] Didn't Put on Air." *Id*. at ¶ 24. Those six excerpts had not been publicly released, nor authorized for release, by NetworkCo News. *Id*.

NetworkCo News hired "DFCo," a digital forensics firm, to investigate the incident. *Id*. at ¶ 25. DFCo determined that StreamCo network user credentials designated to StreamCo customer Network #2 were exposed on a Network #2-affiliated radio station website as early as 2022. *Id*. at ¶ 26. DFCo also determined the below.

- IP address 47.197. 207.14 ("the IP address") was logged into the StreamCo network using the exposed Network #2 credentials without authorization contemporaneously with the October 6 interview for its duration. *Id*. at ¶ 27. ***That IP address was first observed on StreamCo network logs on August 22, 2022, and repeatedly thereafter until at least October 14, 2022***. *Id.* The IP address resolved to Burke's Tampa residence, and was hosting four web domains, including burke-communications.com, ilovecitr.us, and mocksessions.com. *Id*. at ¶ 28.

- Burke was a former Director of Video Editing for a popular news website and had previously worked for at least two other media outlets as an investigative journalist. Though not presently working in the media as a news journalist, Burke maintained a presence by collecting video clips and information and disseminating them via the Internet. Burke owned and operated Burke Communications, advertised on its website as a media consultation company. *Id*. at ¶ 29.

8

Subsequent FBI investigation confirmed that the DFCo information was accurate. *Id.* at ¶ 31. A February 2023 review of the burke-communications.com website revealed links to related pages that touted an archive of news and sports programming, dating to 1969, that consumed more than 50 TB of cloud space, and that Burke retained "181,000 gigabytes of video archive data." *Id.* at ¶ 32. Review of the website ilovecitr.us revealed Burke had expertise regarding monitoring and archiving video feeds, and was familiar with Python script. *Id.* at ¶ 33.

Per StreamCo Chief Technical Officer ("CTO"), StreamCo customers included major media companies that used the StreamCo nonpublic network to stream content. *Id.* at 34. A StreamCo customer would send streamed content from an origin point, a transmission unit, to a receiver unit at a different location. *Id.* The October 6 interview stream was transmitted from California to a receiver unit located at NetworkCo headquarters in New York City. *Id.* StreamCo used a Python script to generate an identifier that is unique to each receiver used within its network. The identifiers were composed of digits used within the StreamCo network to access and identify streamed content. *Id.* Said content was streamed encrypted across the StreamCo network via HLS streams; however, the livestreams were decrypted at one stage in low resolution making them viewable for quality management purposes. *Id.*

Due to an error in the StreamCo website application interface, it would have been possible for an individual who had authenticated (logged) into its website to utilize developer tools embedded in a web browser to access a complete list of the StreamCo receiver identifiers associated with particular customers, allowing that

individual to target and monitor streaming content for those customers. *Id.* at ¶ 35. And, if an individual knew a StreamCo receiver identifier and the format of the StreamCo HLS stream query (both exposed within the password-protected website), that individual could construct a URL to directly access a StreamCo device and monitor a stream without having to authenticate into the StreamCo network. *Id.* The StreamCo CTO confirmed Timothy Burke had not worked at StreamCo, nor was he authorized to access the StreamCo network or any content therein. *Id.* at ¶ 36.

The NetworkCo CTO confirmed that the leaked October 6 interview content had not been leaked by a NetworkCo employee. *Id.* at ¶ 38. Futher, two unidentified IP addresses had accessed the interview stream, one for about 30 minutes and another, IP address 47.197.207.14, which had been logged on during all six of the intercepted and disclosed excerpts. *Id.* at ¶¶ 38. IP address 47.197.207.14 resolved to a carrier maintaining an account on October 6 at Burke's residence. *Id.* at ¶ 52. The NetworkCo CTO confirmed Timothy Burke had never been employed by NetworkCo and did not have permission to access/release the excerpts. *Id.* at ¶ 39.

The Network #2 broadcast engineer maintenance supervisor ("BEMS") explained that the exposed credential was used by Network #2 to demonstrate and sell access to the StreamCo services to Network #2 affiliates. Said credentials were only authorized to be used by the Network #2 sales team. The Network #2 BEMS confirmed that Timothy Burke had never worked for Network #2, nor did he have authorization to use the credentials to access the StreamCo Network. *Id.* at ¶¶ 40-41.

Burke's Twitter account @bxxxxxxog was linked to the website burke-communication.com, had been logged into during January 2023 from IP address 47.197.207.14, and was associated with email address t[redacted]ke@gmail.com. *Id.* at ¶ 43. The phone number associated with that account was a number associated with Burke. *Id.* Burke's Tweets via @bxxxxxxog demonstrated knowledge concerning streaming technology, posted about StreamCo streams, and expressed familiarity with NetworkCo's streaming methods. *Id.* at ¶ 47.

Burke, Person #4, and Person #5 were employed during 2018 by a website company, and they continued to associate with one another following their overlapping time there. *Id.* at ¶¶ 45-46. On October 11, at 3:16 p.m. EDT, Person #4, a WebPub reporter, tweeted a link to the above-mentioned article, which was the first appearance of the unaired interview excerpts in the media. *Id.* at ¶ 44. The Tweet contained a comment and a photo extracted from one of the unauthorized interview excerpts. ***Approximately 5 minutes later***, @bxxxxxxog tweeted the same photo from the interview with a different comment. *Id.* ***Approximately thirty seconds following Burke's Tweet***, Person #4 retweeted Burke's Tweet. O***n the same day approximately 15 minutes after Person #4's retweet***, a second WebPub representative, Person #5, tweeted the same photo with different commentary. *Id.* Records for the telephone number listed on Burke's burke-communications.com website showed that, from October 10 through November 29, Burke exchanged calls on at least ten occasions with Person #5, a WebPub employee. *Id.* at ¶¶ 49-50.

Given Burke's assertions on his website that he retained 181,000 GB of archived video, with 50,000 GB stored on the cloud, investigators determined it was likely that any remaining video was stored at Burke's residence. *Id.* at ¶ 54. The conclusion was drawn from various facts/evidence including photographs posted by Burke to social media and statements made on his websites. *Id.* Some of the photographs showed multiple computers and monitors clustered as an electronic center. *Id.* It also was likely that scripts and devices used to monitor and intercept the interview video streams were stored there. *Id.* The FBI confirmed that a secondary suite behind the main residence appeared suitable to house the necessary electronic equipment. *Id.* at ¶ 55. The affidavit also included an additional section that articulated facts related to the computer devices believed to be housed at Burke's residence and the need and reasons supporting seizure and analysis of those devices. *Id.* at ¶¶ 57-63.

The affidavit did not include Burke's spouse's name or status as a Tampa City councilperson because she was not a subject of the investigation and doing so would have unnecessarily linked her directly to the investigation: an Internet query would have thereafter potentially subjected her to unfair political attacks or allegations. Indeed, had information about her been included in the affidavit, the investigative team would have inevitably faced allegations of unfairly impugning a political actor. The United States is only including this explanation in response to Burke's motion. Burke's non-subject spouse's work was irrelevant to a probable-cause finding.

12

IV.   **Probable Cause**

   i.   **Probable Cause was Established for the Listed Offenses.**

"Probable cause exists if facts within the magistrate's knowledge and of which he had reasonably trustworthy information would warrant a man of reasonable caution in the belief that a crime was committed and that evidence is at the place to be searched." *Betancourt*, 734 F.2d at 754 (quotation omitted). The issuing magistrate need only make a common-sense decision about whether the totality of the circumstances show there is probable cause that the sought-for evidence will be obtained. *Nixon*, 918 F.2d at 900. "A magistrate's decision that probable cause exists is conclusive absent arbitrariness." *Betancourt*, 734 F.2d at 754. After-the-fact scrutiny of the sufficiency of an affidavit should not take the form of de novo review, and a magistrate's probable-cause finding should be paid great deference by reviewing courts. *Gates*, 462 U.S. at 236.

The submitted affidavit amply established probable cause that evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 1030 and 2511, would be found at Burke's residence. Indeed, the affidavit showed that Burke first entered the StreamCo website without authorization on August 22, 2022, using Network #2 credentials despite not being authorized by StreamCo or Network #2 to do so. He then continued to repeatedly authenticate into that website where he obtained and stole StreamCo system-related info, which he then utilized to intercept the transmission of StreamCo customers, at least one of which streams he disclosed to individuals at WebPub. The affidavit also included details regarding Burke's demonstrated technical capabilities, his elaborate computer system, and that system's electronic storage capacities. The affidavit further articulated

13

probable cause as to how and why evidence and fruits of the criminal conduct were likely to be contained on that system and the significance of that evidence to the investigators.

### ii.  Good Faith Forecloses Suppression.

Even if the warrant fell short in establishing probable cause, which it did not, the good-faith exception to the exclusionary rule would foreclose suppression of the evidence obtained through execution of the warrant. When a defendant seeks suppression based on a claim that the affidavit failed to establish probable cause, suppression is warranted only if the "warrant is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *McCall*, 84 F.4th at 1325 (quotation marks omitted). "To exclude evidence on this ground, the affidavit must be so clearly insufficient that it provided no hint as to why police believed they would find incriminating evidence." *Id.* (quotation marks omitted). The "officer's judgment must be more than just mistaken—it must be so plainly incompetent that no officer of reasonable competence would have requested the warrant." *Id.* Those circumstances are not remotely present here.

### V.      Argument

Burke's motion includes baseless allegations of material misrepresentations and claimed omissions that are either flatly untrue, turn out not to be misrepresented or omitted from the affidavit, or are irrelevant to a probable-cause finding. The motion argues without support that the search was an unreasonable intrusion in the protected activities of a "journalist" engaged in gathering and disseminating

newsworthy information, was overbroad and based upon a general warrant, and was not executed reasonably under the circumstances presented. Doc. 65 at 1-2. Burke is wrong as to each contention. Indeed, even if the allegations were correct, which they are not, suppression would not be a permissible remedy. For clarity, the United States fully addresses each issue raised in Burke's motion by subject.

### i.   The Absence of Information About the Department's Internal Administration of its Policies Does Not Render the Affidavit Deficient.

Burke's motion includes multiple baseless suggestions of wrongdoing by the United States' investigative team regarding the Department of Justice's (the "Department's") *Policy Regarding Obtaining Information from or Records of Members of the News Media; and Regarding Questioning, Arresting, or Charging Members of the News Media* (the "News Media Policy"),[3] and the policy requiring authorization for search warrants that may implicate the Privacy Protection Act (PPA). Here, the government has complied with its own News Media Policy and PPA policy.

The News Media Policy. The Department has promulgated internal regulations relating to obtaining information from or records of members of the news media and questioning, arresting, or charging members of the news media.[4] These regulations impose some internal limitations on investigative techniques that

---

[3] 28 CFR 50.10(i)(1) (revised, November 3, 2022).

[4] The Attorney General issued revised News Media Policy regulations on October 26, 2022. The specific changes to the regulations are not relevant here because neither version creates any enforceable rights for any defendant or members of the news media. Unless otherwise noted, citations to the regulations refer to the current version of the rule.

may be used to obtain information from or records of members of the news media and set forth internal Department approval requirements before law enforcement may employ various investigative techniques in relation to members of the news media.

Even if government investigators had not complied with its policies, which was not the case, those policies do not create any substantive or procedural right or benefit, much less a right enforceable through Burke's motion. The News Media Policy is explicit that it "is not intended to, and ***does not, create any right or benefit, substantive or procedural, enforceable at law or equity by any party against the United States***, its departments, agencies, or entities, its officers, employees, or agents, or any other person."[5] 28 C.F.R. § 50.10(t) (emphasis added). Moreover, the policy is clear from its opening paragraph that it "is not intended to shield from accountability members of the news media who are subjects or targets of a criminal investigation for conduct outside the scope of newsgathering." 28 C.F.R. § 50.10(a)(1). The policy specifically defines "newsgathering" to exclude from its scope criminal acts committed in the course of obtaining or using information, such as unlawfully accessing a computer or a computer system, and unlawful surveillance or wiretapping. 28 C.F.R. § 50.10(b)(2)(ii)(B). Burke's motion cites no

---

[5] The Fourth Circuit has explained that the Department's news media policy "is of the kind to be enforced internally by a governmental department, and not by courts through exclusion of evidence." *In re Shain*, 978 F.2d 850, 854 (4th Cir. 1992). Regardless, any internal administrative disciplinary action (not warranted here) is not available as a remedy for a subject seeking to upend an ongoing federal criminal investigation.

law, statutory or otherwise, that required the affidavit to include information about internal Department deliberative matters, such as a request for and approval of authorization to seek a search warrant. There is none, and the absence in the affidavit about that internal matter is of no consequence.[6]

The PPA. Relatedly, Burke's motion argues the evidence must be suppressed because the affidavit failed to include confirmation that the investigators had secured the required approval for the search, in accordance with the Department's policy regarding the PPA, and concealed from the magistrate judge that the proposed search was presumptively unlawful under the PPA. Doc. 65 at 10. Both of Burke's assertions regarding the PPA are baseless. First, as explained above, there is no basis for the proposition that the submitted affidavit should have included information regarding compliance with the Department's PPA policy. Second, the PPA is explicitly inapplicable to a determination of Burke's motion. Whereas the PPA authorizes a civil action to be brought by a person aggrieved by a search for or seizure of materials in violation of the provision, it specifically directs that "[e]vidence otherwise admissible in a proceeding shall not be excluded on the basis of a violation of this chapter." 42 U.S.C. § 2000aa-6(a)&(e).[7] This is a red herring.

---

[6] *See, e.g., In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1153 (D.C. Cir. 2006) (Department's news media guidelines were "not required by any constitutional or statutory provision" and "provide no enforceable rights to any individuals"); *In re Special Proceedings*, 373 F.3d 37, 44 n. 3 (1st Cir. 2004) (news media guidelines do not create legally enforceable rights).

[7] Moreover, the PPA would not have served to protect Burke's possession of the information and items authorized for seizure under the warrant for another dispositive reason. The PPA by its terms does not apply to contraband, fruits, or things criminally possessed. 42 U.S.C. § 2000aa-7(a)&(b).

### ii. The Affidavit Contained Sufficient and Accurate Information About Burke and His Home Workspace, and the Resulting Search was Not an Intrusion of Protected First Amendment Activities.

Burke's motion erroneously argues that the affidavit was deficient because it did not describe Burke as an award-winning journalist operating a newsroom and resulted in an intrusion of protected First Amendment activities. *Id.* at 3, 8-11, 17, and 19. Burke's unsupported claims regarding his work are inconsistent with how Burke himself described that work during the period covered by the warrant. Burke's resume, published by him in May 2023 on his ilovecitr.us website, reflects that Burke had previously worked for the Gizmodo Media Group and The Daily Beast *from 2011 through 2019*. Doc. 52-1. Thereafter, Burke had publicly categorized himself as a consultant, describing his work on his burke-communications.com website as concerning "Social/Political/Media Consulting," and stating on his ilovecitr.us website that he was a "media + political communications consultant, broadcast monitor, archival technologist, and viral content visionary." *Id.* That information, published by Burke, was accurately captured in the affidavit. Ex.1 at ¶¶ 28-29.

Burke's present claim that he was instead working as a journalist is a red herring. Regardless of how Burke now categorizes his work ("journalist" or "consultant"), neither the First Amendment nor any other authority granted Burke immunity from investigation and prosecution if he obtained information through his own criminal acts, in violation of 18 U.S.C. §§ 1030 and 2511. Indeed, even "presumptively protected materials are not necessarily immune from seizure under

warrant for use at a criminal trial." *Zurcher*, 436 U.S. at 567. As explained in *Zurcher*, "[t]he hazards of such warrants can be avoided by a neutral magistrate carrying out his responsibilities under the Fourth Amendment, for he has ample tools at his disposal to confine warrants to search within reasonable limits." *Id*. And, as recognized by the Supreme Court, it would be "frivolous" to assert—much less hold—that a reporter or his sources would have a "license . . . to violate valid criminal laws." *Branzburg v. Hayes*, 408 U.S. 665, 691 (1972).

The ample facts contained within the affidavit presented probable cause that Burke had committed criminal acts, in violation of 18 U.S.C. §§ 1030 and 2511, and that evidence of those crimes likely existed at his residence. The search of his residence for evidence of his crimes was entirely reasonable. Further, the absence in the affidavit of Burke's unsupported claims regarding his work status (contradicted by his own published information) does not amount to a material omission.

### iii. The Affidavit Did Not Misrepresent or Omit Material Facts or Law Regarding the CFAA or the Wiretap Act.

Burke's motion erroneously argues that the affidavit omitted critical facts and deceived the magistrate judge regarding alleged CFAA violations of 18 U.S.C. § 1030(a)(2)(C). Doc. 65 at 8-9. The motion claims the magistrate judge should have been informed that "downloading information without authorization" is not a crime under *United States v. Van Buren*, 940 F.3d 1192 (11th Cir. 2019), rev'd and remanded, *Van Buren v. United States*, 593 U.S. 374 (2021). Section 1030(a)(2)(C) is drafted in the disjunctive and can be violated in two different ways. The Supreme

Court in *Van Buren* addressed only the second prong of § 1030(a)(2), that being where a person "accesses a computer with authorization but then obtains information located in particular areas of the computer . . . that are off limits to him." *Id*. at 1662. *Van Buren*, however, had no impact on the first prong of § 1030(a)(2) and Burke's conduct as described in the affidavit violates that prong.

Next, Burke's motion similarly presents partial information about the elements of a violation of § 2511 under the Wiretap Act to erroneously argue that the affidavit "actively deceived" the magistrate by omitting information about the conduct required to prove such a violation. Doc. 65 at 7-8. Like the above-discussed CFAA violation, § 2511(1)(a) is also drafted in the disjunctive and can be violated by intentionally intercepting any "wire, oral, or electronic communication." Thus, it is irrelevant to a determination of probable cause whether the individuals participating in the October 6 interview were in the same location because, per the affidavit, the interview was intercepted by Burke in real time as it was being transmitted over the Internet from California to New York City, and later disclosed. Ex. 1 at ¶¶ 22-23 and 34-35. Under the Wiretap Act, that intercepted audio/video transmission contained both wire (human voice) and electronic communications (images and other electronic information) and amounted to a violation of § 2511(1)(a).[8]

The affidavit actively and fully informed the Court of the circumstances that led to Burke monitoring and intercepting the StreamCo URL streams, including how

---

[8] *See* 18 U.S.C. § 2510(1) & (18) & (12), respectively, defining types of communications.

the StreamCo video-feed URLs were constructed, how Burke likely obtained and stole the information necessary for him to construct them, and the inconceivable prospect that Burke could simply have guessed the URLs instead. Ex. 1 at ¶ 34-35. Burke's present defense theory that the intercepted stream was "readily accessible to the public" and so not covered under the Wiretap Act is a possible defense to be raised at trial, should Burke elect to do so.[9] Of course, that defense ignores that Burke was only able to access that intercepted stream by utilizing information he obtained and stole from the StreamCo password-protected website after he gained unauthorized access using Network #2 credentials. The known existing facts that established probable cause to believe that Burke had committed a violation of § 2511 were properly included in the affidavit. That is sufficient. The affidavit did not include any known incorrect or misleading facts or information or omit any of the same regarding the application of § 2511.

Finally, Burke's motion also wrongly claims that the magistrate judge should have been told that Burke's disclosure of intercepted communications was a publication of truthful newsworthy information and so protected speech under *Bartnicki v. Vopper*, 121 S.Ct. 1753 (2001). Doc. 65 at 8-9. *Bartnicki* clarified whether: "the publisher of information [who] has obtained [it] in a manner lawful in itself but from a source who has obtained it unlawfully, may the government punish

---

[9] The exceptions for criminal liability under 18 U.S.C. § 2511(1)(a) and (c) listed in 18 U.S.C. § 2511(2)(g)(i)-(v), including the exception for intercepting an electronic communication that is "readily accessible to the general public," are affirmative defenses. *See, e.g. United States v. McArthur*, 108 F.3d 1350, 1353 (11th Cir. 1997).

[subsequent] publication of that information based on the defect in a chain?" *Id*. at 1762. Here, the affidavit articulated facts that established probable cause that ***Burke himself, not some other source,*** had violated § 2511 when he intercepted the October 6 interview stream in real time and later disclosed it to another. *Bartnicki* is inapplicable here. The affidavit did not misrepresent or omit material facts or law regarding the CFAA or the Wiretap Act as claimed by Burke.

### iv. Anonymizations Did Not Undermine the Probable Cause Determination.

Burke's motion also argues, without support, that the use in the affidavit of anonymizations to identify individuals and entities cannot result in a finding of probable cause because the anonymized individuals and entities do not exist. *e.g.*, Doc. 65 at 5-6. That is nonsensical. That anonymized identifiers were utilized in the affidavit was specifically noted in the affidavit itself and were supplemented with additional descriptive information that provided the magistrate judge ample context in which to review and consider the probable cause determination. Indeed, it is rarely the case that a reviewing magistrate judge knows all the individuals and entities identified within an affidavit under consideration. Notwithstanding, reviewing magistrates can appreciate the conduct and roles of the included participants and make probable cause determinations. That argument should be summarily rejected.

### v. The Warrant was Not a General Warrant and Was Executed Reasonably.

Burke's motion also erroneously argues that the warrant was a prohibited

"general warrant" lacking any guidance for the seizing agents, which resulted in an overly broad rummaging through Burke's materials. Doc. 65 at 14-15. That conclusory argument ignores the warrant's contents and the guidance in *Weinstein*, 762 F.2d at 1532, that a warrant "need only describe the place to be searched with sufficient particularity to direct the searcher, to confine his examination to the place described, and to advise those being searched of his authority." *See also Betancourt*, 734 F.2d at 754-55; *and see Bradley*, 644 F.3d at 1259 (neither "elaborate specificity" nor "technical perfection" required); *Wuagneux*, 683 F.2d at 1348-49 (". . . particularity requirement must be applied with a practical margin of flexibility, depending on the type of property to be seized" and nature of investigation).

Here, the warrant described the items to be seized as records and evidence that reflected violations of 18 U.S.C. §§ 1030 (intentional unauthorized access of a computer), and 2511 (intentional interception and disclosure of wire, oral, or electronic communication), that involved one subject, Timothy Burke, and that occurred between August 1, 2022, and May 8, 2023. The warrant further specified six categories of potential evidence and, for computers and other storage devices, provided additional guidance, all of which was supported by the affidavit. This description provided ample direction to searchers and readily satisfied the Fourth Amendment's particularity requirements. *See McCall*, 84 F.4th at 1327. "A warrant does not have to be elaborate. Rather it need only be as narrow as reasonably expected given the state of the investigator's knowledge and the nature and extent of criminal activities under investigation." *Id.* (citations and quotation omitted). Federal

courts have recognized that a warrant authorizing seizure of computers for a subsequent off-site electronic search is not unreasonable or overbroad, provided probable cause supports a "sufficient chance of finding some needles in that computer haystack." *United States v. Evers*, 669 F.3d 645, 652 (6th Cir. 2012) (citation omitted).

Even assuming the description fell short, which it did not, the good faith exception to the exclusionary rule forecloses suppression. Insufficient particularity in a warrant can lead to suppression only when the warrant is "so facially deficient," *i.e.*, so lacking in particularity, that "the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923; *see Blake*, 868 F.3d at 975. Nothing like that happened here. Regardless of Burke's criticisms, it was "objectively reasonable" for agents to rely on the warrant. *United States v. Travers*, 233 F.3d 1327, 1329 (11th Cir. 2000) (quotation marks omitted). The affidavit here is certainly "not so facially deficient . . . that the executing [agents] could not have reasonably presumed it to be valid." *Id.* at 1330 (quotation marks omitted).

Burke's motion cites as support a collection of unanalogous cases, including three cases concerning search warrants that authorized the seizure of books and materials based upon their perceived offending contents. Doc. 65 at 6 n.4. The motion also cites to two easily distinguished cases: *United States v. Stefonek*, 179 F.3d 1030, 1032-1034 (7th Cir. 1999) and *United States v. Srivastava*, 476 F.Supp.2nd 509 (D.Md. 2007). *Stefonek* concerned a warrant that was two open-ended, only describing the things to be seized as "evidence of crime." *Srivastava* was a district

24

case from another circuit in which the Court found the agents blatantly exceeded the scope of the warrant. Neither *Stefonek* nor *Srivastava* is applicable here.

Burke also wrongly argues that the scope of the warrant and subsequent execution of the search was unreasonable and without the (purported) level of "scrupulous exactitude." Doc. 65 at 1, 6, 10, 12-18. Burke again supports that argument with erroneous conclusions of law and unsupported facts regarding the manner of the warrant's execution and seizures, ignoring the warrant language and the investigative team's good-faith conduct—including the use of a filter review process. Burke's motion insists that the agents seized materials constituting "everything Mr. Burke ever downloaded, viewed, or accessed," Doc. 65 at 15, amounting to "the sum of an individual's private life." *Id.* at 17. But it is inarguable the seizing agents left behind a stockpile of electronic devices, and the United States filed periodic reports tracking the systematic return of seized property with the Court that issued the warrant.[10] And Burke offers no specific examples to substantiate his argument, much less demonstrate the "flagrant disregard" of the terms of the warrant required to prevail on such a claim. *See Wuagneux*, 683 F.2d at 1354. Burke's motion presents no supported facts showing that the investigative team possesses material exceeding the warrant's scope, and even if he did, that alone would be insufficient to mandate suppression. "[A]bsent a flagrant disregard of the terms of the warrant, the seizure of items outside the scope of a warrant will not affect admissibility of items

---

[10] *See, e.g.*, Case No. 8:23-mc-00014-WFJ-SPF, Docs. 37, 37-1, 40, 40-1, 47, 47-1, and 49-1.

properly seized." *Id.* (quotation marks omitted). The warrant was executed in a reasonable manner, and Burke's motion should be denied.

### vi. Burke's Request For a *Franks* Hearing Should be Denied.

"There is . . . a presumption of validity with respect to the affidavit supporting the search warrant," *Franks v. Delaware*, 438 U.S. 154, 171 (1978); *United States v. Lebowitz*, 676 F.3d 1000, 1010 (11th Cir. 2012). The Supreme Court has held that this presumption of validity can only be challenged in a very limited set of circumstances. *Franks*, 438 U.S. at 171-12. First, a defendant must make an offer of proof beyond conclusory assertions that the affiant either "knowingly and intentionally included a false statement in an affidavit" or "made the false statement with reckless disregard for its truth." *United States v. Sims*, 845 F.2d 1564, 1571 (11th Cir. 1988) (citing *Franks*, 438 U.S. at 171-72). Even if a defendant can make a preliminary showing of the affiant's knowing or reckless intent, he must still show that the false statement was necessary to the finding of probable cause. *Sims*, 845 F.2d at 1571 ("Insignificant and immaterial misrepresentations or omissions will not invalidate a warrant.") (quotation omitted). In the case of material omissions, the defendant must prove that "the alleged omission would have prevented a finding of probable cause." *Lebowitz*, 676 F.3d at 1010.

A defendant who fails to meet either prong of this analysis is not entitled to a hearing under *Franks. United States v. Barsoum*, 763 F.3d 1321, 1328 (11th Cir. 2014) ("*Franks* requires that a defendant make a substantial preliminary showing that

26

statements or omissions are intentionally false or recklessly misleading, and that those statements or omissions altered the probable cause showing."). *Id.* at 1329. It is not enough to argue a *Franks* hearing would allow defendant to show the information in question was false and deliberately or recklessly included or omitted. *Id.* A defendant must make a ***preliminary showing*** that is "more than conclusory and must be supported by more than a mere desire to cross-examine." *Id.* (quoting *Franks*, 438 U.S. at 171). "Allegations of negligence or innocent mistake are insufficient." *Franks*, 438 U.S. at 171. And even "if these requirements are met," a hearing is still not warranted "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause." *Id.* at 171-72.

In addition to affirmative false statements, *Franks* may also apply to omissions, but only if they are intentionally or recklessly misleading and material to a finding of probable cause. "An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation," *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990), and scrutinizing an affidavit for "omission[s] potentially opens officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit," *United States v. Graham*, 275 F.3d 490, 506 (6th Cir. 2001) (quotation marks omitted). As such, a defendant must make a substantial preliminary showing that an omission was deliberately or recklessly misleading, not "made negligently or because

27

of an innocent mistake." *United States v. Whyte*, 928 F.3d 1317, 1333 (11th Cir. 2019). And the omission must be material, meaning that "inclusion of the omitted facts would have prevented a finding of probable cause." *United States v. Kapordelis*, 569 F.3d 1291, 1309 (11th Cir. 2009) (quotation marks omitted).

Burke's motion fails to make a showing of a *Franks* violation, much less the required "substantial preliminary showing" to justify such a hearing, making his request wholly deficient. *See, e.g., Barsoum,* 763 F.3d at 1328-29.  Indeed, Burke's motion offers nothing more than misplaced conclusory opinions and arguments to assert the affiant knowingly and intentionally included a false statement in the affidavit, made a false statement with reckless disregard for the truth, or intentionally or recklessly omitted information pertinent to a probable-cause finding. *See Id*. And it is not enough for Burke to insist that a *Franks* hearing would allow him to show that information in question was false or recklessly included or omitted. *Id*.; and *see Sims*, 845 F.2d at 1571. More problematic, the topics proposed for the requested hearing—an inquiry into privileged internal government deliberations, determinations, and investigative efforts—are divorced from a probable-cause determination. Doc. 65 at 19-20. That would be an abuse of *Franks*, and Burke's request should be denied.

## VI.    Conclusion

Wherefore, Burke's motion and request for *Franks* hearing should be denied.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

By:    /s/Jay G. Trezevant
       Jay G. Trezevant
       Assistant United States Attorney
       Florida Bar No. 0802093
       400 N. Tampa St., Suite 3200
       Tampa, Florida 33602-4798
       Telephone: (813) 274-6000
       Email: jay.trezevant@usdoj.gov


       /s/Adam J. Duso
       Adam J. Duso
       Assistant United States Attorney
       Florida Bar No. 1026003
       400 N. Tampa St., Suite 3200
       Tampa, Florida 33602-4798
       Telephone: (813) 274-6000 Email:
       adam.duso@usdoj.gov

**U.S. v. TIMOTHY BURKE**          **CASE NO. 8:24-cr-00068-KKM-TGW**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on July 26, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to counsel for the Defendant.


*/s/ Jay G. Trezevant*
Jay G. Trezevant
Assistant United States Attorney