## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

TIMOTHY BURKE,

        Defendant.

Case No: 8:24-cr-00068-KKM-TGW

## MOTION OF THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS FOR LEAVE TO FILE AMICUS CURIAE BRIEF

The Reporters Committee for Freedom of the Press ("Reporters Committee" or "amicus") respectfully moves for leave to file the accompanying amicus curiae brief in support of Defendant Timothy Burke's Motion to Dismiss Indictment and in response to the Court's request for amicus input.  *See* (Doc. 128), at 4–5.  Neither the United States nor Defendant object to the filing.

District courts have broad discretion to grant leave to file an amicus curiae brief.  *See Conservancy of Sw. Fla. v. U.S. Fish & Wildlife Serv.*, No. 2:10-cv-106-FTM-SPC, 2010 WL 3603276, at *1 (M.D. Fla. Sept. 9, 2010).  Amicus briefs are appropriately accepted when the amicus "can contribute to the court's understanding of the matter in question."  *Id.* (citation omitted).

Such is the case here.  The Reporters Committee is an unincorporated nonprofit association founded by leading journalists and media lawyers in 1970

when the nation's news media faced an unprecedented wave of government

subpoenas forcing reporters to name confidential sources.  Today, its attorneys

provide pro bono legal representation, amicus curiae support, and other legal

resources to protect First Amendment freedoms and the newsgathering rights of

journalists.

Amicus therefore has a strong interest in ensuring that federal criminal laws

like the Wiretap Act are not applied in ways that dissuade journalists from

engaging in constitutionally protected newsgathering activity and reporting on

matters of public concern.  The Reporters Committee has filed amicus briefs in and

written extensively on cases that illustrate the danger to public interest

newsgathering of laws that can be read to criminalize accessing publicly available

information online.  *See, e.g.*, Brief for Reps. Comm. for Freedom of the Press as

Amicus Curiae Supporting Petitioner, *Van Buren v. United States*, 593 U.S. 374

(2021) (No. 19-783), https://perma.cc/N877-ADHY (filed July 8, 2020); Brief for

Reps. Comm. for Freedom of the Press as Amicus Curiae Supporting Appellants,

*City of Fullerton v. Friends for Fullerton's Future*, No. G058996 (Cal. Ct. App. Jan 4,

2021), https://perma.cc/V5SP-J2JL; Grayson Clary, *When Spurious 'Hacking'*

*Claims Chill Journalism*, Reps. Comm. for Freedom of the Press (Oct. 25, 2021),

https://perma.cc/8FTJ-BJFD.

Amicus respectfully requests leave to file the attached amicus brief to

address aspects of questions (2) and (3) on which the Court seeks briefing.

Specifically, amicus submits that construing 18 U.S.C. § 2511(1)(a) to cover a person

"watching a video on an internet streaming platform[,] visiting a public-facing
webpage," or accessing any other publicly accessible information online – even if the
exposure of that information was inadvertent – would violate the First Amendment.
Amicus further argues that, as such, the "readily accessible" exception "embodies
the culpability of the offense" and therefore must be negated as an essential
element of the offense in the indictment. *United States v. Outler*, 659 F.2d 1306,
1309 (5th Cir. Unit B 1981). To treat that exception as an affirmative defense
would transform the Wiretap Act into a potent tool to chill and suppress public
interest newsgathering, especially in cases where the reporting is perceived by the
government as critical or unfavorable.

For the foregoing reasons, the Reporters Committee respectfully requests
leave to file the attached amicus brief.

Respectfully submitted,

/s/ Gabe Rottman
Gabe Rottman (*pro hac vice*)
  *Counsel of Record*
Mara Gassmann*
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
grottman@rcfp.org

*Counsel for Amicus Curiae*

**\* Of Counsel**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

   v.

TIMOTHY BURKE,

        Defendant.

Case No.: 8:24-cr-00068-KKM-TGW

**BRIEF OF PROPOSED AMICUS CURIAE THE**
**REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS**
**IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS INDICTMENT**

Gabe Rottman (*pro hac vice*)
  *Counsel of Record*
Mara Gassmann\*
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
grottman@rcfp.org

*Counsel for Amicus Curiae*

*\* Of Counsel*

## TABLE OF CONTENTS

**Page:**

INTEREST OF AMICUS CURIAE ....................................................................... 1

INTRODUCTION ................................................................................................. 1

ARGUMENT ......................................................................................................... 4

I.    The risks for journalists were the government's legal theory here
      credited are far from hypothetical. ......................................................... 4

II.   The danger of the government's legal theory for journalists supports
      treating the readily-accessible exception as an essential element of the
      offense under the relevant caselaw. ....................................................... 8

CONCLUSION ..................................................................................................... 13

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*hiQ Labs, Inc. v. LinkedIn Corp.*,
   31 F.4th 1180 (9th Cir. 2022) ................................................................... 10

*Ostergren v. Cuccinelli*,
   615 F.3d 263 (4th Cir. 2010) ..................................................................... 3

*Snow v. DirecTV, Inc.*,
   450 F.3d 1314 (11th Cir. 2006) ................................................................ 10

*Speiser v. Randall*,
   357 U.S. 513 (1958) ................................................................................... 8

*United States v. Outler*,
   659 F.2d 1306 (5th Cir. Unit B 1981) ............................................... 2, 3, 11

*United States v. McArthur*,
   108 F.3d 1350 (11th Cir. 1997) ........................................................ 3, 9, 10

*United States v. Moore*,
   423 U.S. 122 (1975) ................................................................................. 11

*Van Buren v. United States*,
   593 U.S. 374 (2021) ................................................................................... 6

**Statutes:**

18 U.S.C. § 2510 ............................................................................................ 8

18 U.S.C. § 2511 ................................................................................... *passim*

**Other Authorities:**

Bruce D. Brown & Gabe Rottman, *Claims of 'Computer Crime' Can Gag
   Media*, L.A. Times (Aug. 31, 2023) ..................................................... 4, 7

Grayson Clary, *For Data Journalists, An Important Legal Victory*, Reps.
   Comm. for Freedom of the Press (May 2, 2022) ....................................... 6

Grayson Clary, *Parler Wasn't Hacked, and Scraping Is Not a Crime*, Lawfare
   (Feb. 1, 2021) ............................................................................................ 6

H.R. Rep. No. 99-647 (1986) ................................................................. 3, 12

Jason Hancock, *Claim That Reporter Hacked State Website Was Debunked. Parson Still Says He's a Criminal*, Mo. Indep. (Feb. 23, 2022) ................................ 5

John Hanna, *The Online Search Spurring a Raid on a Local Kansas Paper was Legal, a State Agency Says*, A.P. (Aug. 21, 2023) ............................................... 4

Jon Brodkin, *Missouri Governor's Wild Claims About Journalist Debunked in Police Report*, Ars Technica (Feb. 22, 2022) ............................................... 5

Joseph Marks, *This Reporter Became a Poster Child for Overbroad Hacking Laws*, Wash. Post (Mar. 4, 2022) ............................................... 5

Order Dismissing Pet., *Florida v. Cruz*, No. 18-1958CF10A (May 13, 2019) ............................................... 7

Rachel Treisman, *A Missouri Newspaper Told the State About a Security Risk. Now It Faces Prosecution*, N.P.R. (Oct. 14, 2021) ............................................... 3

S. Rep. No. 99-541 (1986) ............................................... 12

Sofia Andrade & Paul Farhi, *After a Police Raid on a Kansas Newspaper, Questions Mount*, Wash. Post (Aug. 13, 2023) ............................................... 4

## INTEREST OF AMICUS CURIAE

Proposed amicus curiae is the Reporters Committee for Freedom of the Press (the "Reporters Committee" or "amicus"), an unincorporated nonprofit association founded by leading journalists and media lawyers that advocates for the First Amendment rights of the press. Amicus has an interest in ensuring that the Wiretap Act is not enforced or interpreted in a manner that hinders or dissuades the press from gathering and reporting news in the public interest. Amicus writes to underscore the wide-ranging implications of the government's argument that it may bring a Wiretap Act claim without alleging and proving at trial that electronic communications intercepted online are inaccessible to the public.

## INTRODUCTION

The Reporters Committee submits this brief in response to the Court's invitation to address aspects of two questions. In Question (2), the Court asks whether a "person watching a video on an internet streaming platform or visiting a public-facing website" could be seen to violate 18 U.S.C. § 2511(1)(a) "without considering any of the statutory exceptions." *See* Defs.' Mot. to Dismiss Indictment at 4 (Doc. 128). In Question (3), the Court asks whether, "to avoid the chilling of protected activity" the First Amendment "requires the government, in some cases, to allege in the indictment and to negate at trial a statutory exception to a criminal offense." *Id.* at 5.

If an individual can be indicted under the Wiretap Act for accessing electronic communications on a website that has been configured such that those

1

communications are accessible publicly over the internet, that legal theory could pose a significant threat to public interest newsgathering and reporting. Accordingly, amicus submits that the "readily accessible" exception in 18 U.S.C. § 2511(2)(g)(i) "embodies the culpability of the offense" such that it must be pled by the government as an essential element of the crime, not as an affirmative defense.[1] *United States v. Outler*, 659 F.2d 1306, 1309 (5th Cir. Unit B 1981). Were it merely an affirmative defense – placing the burden on the journalist or news organization to undergo the expense and burden of trial to vindicate the legality of the newsgathering – it would transform the Wiretap Act into a potent tool for the government to chill or suppress reporting that it perceives as critical or unfavorable.

Amicus therefore presents two arguments in support of the motion to dismiss. First, amicus submits that the risks for journalists are far from hypothetical should the government's legal theory be credited. Journalists, especially data journalists, routinely rely on information accessed online in their reporting. Routinely, too, it would be difficult or impossible for a reporter to know before visiting a readily accessible website that its owner privately intended that the information remain secret. And, not infrequently, the crux of the story being reported is itself that a website has been mistakenly configured to make sensitive information available publicly, mistakes that are indisputably newsworthy and their disclosure in the public interest. Rachel Treisman, *A Missouri Newspaper Told the State About a*

---

[1] Amicus takes no position on whether the consent exception in § 2511(2)(d) is an essential element of the offense under § 2511(1)(a).

*Security Risk. Now It Faces Prosecution*, N.P.R. (Oct. 14, 2021), https://perma.cc/ ZV8P-8PFW; *see also Ostergren v. Cuccinelli*, 615 F.3d 263, 277 (4th Cir. 2010) (evidence of failure to safeguard private information "plainly concerns a matter of public significance" (internal citation omitted)).  If the Wiretap Act could be used as a predicate for an investigation and the basis for prosecution without considering the readily-accessible exception, the open internet would be a minefield of unforeseeable liability for data journalists, and the statute could be used, too, by the government in retaliatory efforts to suppress reporting on data breaches – as similar computer-crime laws already have been in a number of high-profile cases.

Second, that insight informs whether the readily-accessible exception in § 2511(2)(g) should be treated as an essential element of the offense in § 2511(1)(a) under the three-part inquiry articulated in *United States v. McArthur*, 108 F.3d 1350, 1353 (11th Cir. 1997), as well as the reasoning of *United States v. Outler*, 659 F.2d 1306 (5th Cir. Unit B 1981).  The fundamental architecture of the internet is designed around facilitating public access to the information that its users host, and the Wiretap Act was never intended to undermine that logic. That is, it was never meant to cover individuals who retrieve publicly accessible information without "encounter[ing] any warnings, encryptions, password requests, or other indicia of intended privacy."  H.R. Rep. No. 99-647, at 62 (1986).  But the government's theory would invert that architecture, creating a presumption that every journalist who visits a website without prior permission commits a crime, and stripping the Act's scope of any nexus to the conduct that "embodies the culpability of the offense."

3

*Outler*, 659 F.2d at 1309.  Neither the statute nor the First Amendment can tolerate that result.

## ARGUMENT

### I.    The risks for journalists were the government's legal theory here credited are far from hypothetical.

In August 2023, the police chief in the town of Marion, Kansas, executed a search warrant at the offices of the Marion County Record, the local newspaper, and the home of the publisher and his mother.  The raid – and the death of the publisher's mother the day after – immediately became national and international news.  Sofia Andrade & Paul Farhi, *After a Police Raid on a Kansas Newspaper, Questions Mount*, Wash. Post (Aug. 13, 2023), https://perma.cc/NCJ3-DVFY.  Though it received less attention in the coverage, one predicate for the raid was a suspected violation of the state computer crime statute based on, it ultimately turned out, a reporter at the Record accessing a state website and acquiring information that was meant to be publicly available.  *See* John Hanna, *The Initial Online Search that Spurred a Raid on a Local Kansas Paper was Legal, a State Agency Says*, A.P. (Aug. 21, 2023), https://perma.cc/DR5G-G3JA.  The ultimate problem that led to the raid and the ensuing controversy was "the endlessly elastic nature of computer fraud laws" and how they commonly fail to explicitly limit their scope to the unauthorized access to information that is behind some kind of "gate," like a password.  *See* Bruce D. Brown & Gabe Rottman, *Claims of 'Computer Crime' Can Gag Media*, L.A. Times (Aug. 31, 2023), https://perma.cc/R998-N4R8.

Indeed, with more newsgathering taking place online, reporters occasionally uncover serious cybersecurity risks with websites that are mistakenly configured to permit public access to sensitive information. Following ethical disclosure principles, reporters that uncover these issues will give the website owner the opportunity to patch the vulnerability before going to press, but this kind of reporting is indisputably in the public interest. Again, however, because of the vagueness and malleability of these laws, they can be deployed against the reporter.

In Missouri, for instance, Josh Renaud, a reporter at the St. Louis Post-Dispatch, discovered that a state website had been inadvertently misconfigured to expose teachers' social security numbers in the site's HTML code. The journalist notified the affected agency, which fixed the problem, and then published the story. The governor, however, demanded an investigation into the reporter and the story that, after significant stress and burden for the journalist, led federal and state authorities to determine that no crime had been committed. *See* Jason Hancock, *Claim That Reporter Hacked State Website Was Debunked. Parson Still Says He's a Criminal*, Mo. Indep. (Feb. 23, 2022) (quoting county prosecutor's concern that statute was so vague it could apply to "using a computer to look up someone's information"). The governor's demand was based on the theory that acquiring information from a misconfigured but publicly accessible website could constitute hacking. Joseph Marks, *This Reporter Became a Poster Child for Overbroad Hacking Laws*, Wash. Post (Mar. 4, 2022), https://perma.cc/E87Y-D5C5; Jon Brodkin, *Missouri Governor's Wild Claims About Journalist Debunked in Police*

*Report*, Ars Technica (Feb. 22, 2022) (noting that affected state agency "confirmed that Renaud only accessed publicly available data"), https://perma.cc/SR42-8579.

Applying § 2511(1)(a) of the Wiretap Act without considering whether a website is configured to be publicly accessible would also pose significant risks for routine data journalism, where reporters often rely on software to collect information efficiently – so-called scraping. When using an automated process to collect information in that context, it would often be difficult or impossible for a journalist to know in advance whether some of the online resources to be visited were privately intended to be kept private. *See, e.g.*, Grayson Clary, *Parler Wasn't Hacked, and Scraping Is Not a Crime*, Lawfare (Feb. 1, 2021), https://perma.cc/CG5P-AHB8 (offering the example of a website that continued to host 'deleted' content at publicly accessible URLs). That issue has led federal courts, and ultimately the Supreme Court, to determine that the Computer Fraud and Abuse Act would likely be unconstitutionally vague were its provisions not limited to bypassing some kind of access "gate." *See Van Buren v. United States*, 593 U.S. 374, 394 (2021) (noting that if "exceeds authorized access" provision in CFAA applied to mere violation of computer-use policy, "millions of otherwise law-abiding citizens are criminals"); Grayson Clary, *For Data Journalists, An Important Legal Victory*, Reps. Comm. for Freedom of the Press (May 2, 2022) (exploring caselaw following *Van Buren* and noting importance to data journalists). Otherwise, computer-crime laws would effectively operate as a flat ban on using any routine data-journalism technique – from scraping to the use of search operators – that risks surfacing

6

information that a website owner secretly intended to keep secret. The government's interpretation of the Wiretap Act carries the same risk.

Additionally, were the offense in § 2511(1)(a) to permit investigations and prosecutions based solely on allegations of accessing a website, without regard to whether it is configured to be publicly accessible, the Wiretap Act could become another tool for authorities to seek to suppress reporting based on inadvertently disclosed information that the government perceives as unfavorable. In August 2018, for instance, the Sun Sentinel published an article on a consultant's report commissioned by the Broward County school system in the wake of the mass shooting at Marjory Stoneman Douglas High School. The report contained the indisputably newsworthy conclusion that the school system twice failed to comply with state and federal law governing students with disabilities. That detail, however, featured in portions of the report that had been ordered redacted by a court but were mistakenly made publicly accessible by the school board itself in the version of the report that it posted on its website. The board then petitioned to have the Sun Sentinel and its reporters held in contempt – resulting in a court battle lasting close to a year before the court dismissed the contempt petition as a clear affront to the First Amendment. *See* Order Dismissing Pet., *Florida v. Cruz*, No. 18-1958CF10A (May 13, 2019), available at https://perma.cc/M24J-AU72.

Under the government's theory here, the school board could sue or prosecutors could seek an indictment pursuant to § 2511(1)(a), and the newspaper and reporters would bear the burden of establishing at trial that the school board's

website was configured to make the report "readily accessible to the public." That kind of uncertainty would create a "temptation for public officials to employ" the law "against reporters – especially those uncovering news they would prefer to remain hidden . . . ." Brown & Rottman, *supra*.

The discussion above underscores the fundamental vagueness and overbreadth concerns that would arise were the readily-accessible exception not an element of the offense in § 2511(1)(a). "The man who knows that he must bring forth proof and persuade another of the lawfulness of his conduct necessarily must steer far wider of the unlawful zone than if the State must bear these burdens." *Speiser v. Randall*, 357 U.S. 513, 526 (1958). Here, the inherent uncertainty of the scope of the Wiretap Act under the government's proposed construction could dissuade the press and public from engaging in potentially a significant amount of constitutionally protected activity. And that militates strongly in favor of requiring the government to establish that an offense under § 2511(1)(a) based on access to a website on the public internet does not fall under the readily-accessible exception.

II. **The danger of the government's legal theory for journalists supports treating the readily-accessible exception as an essential element of the offense under the relevant caselaw.**

Read literally and in isolation, the offense in § 2511(1)(a) of the Wiretap Act would cover the acquisition of any data from any publicly accessible website. It provides that "any person who . . . intentionally intercepts [or] endeavors to intercept" or procures another person to do the same of any "wire, oral, or electronic communication" violates the statute. 18 U.S.C. § 2511(1)(a). Interception is defined

8

as "aural or other acquisition," 18 U.S.C. § 2510(4), and "electronic communication" is defined broadly enough to cover any data accessed on the public internet that is not a wire or oral communication, *id.* § 2510(12). As the government notes, "acquisition" is simply the "possession of or dominion over something," including the downloading of data from a website. *See* Gov't Resp. to Mot. to Dismiss Indictment at 9 (Doc. 138).[2]

Under *McArthur*, a three-part inquiry guides whether an exception to a criminal statute should be treated as an element of the offense or an affirmative defense. 108 F.3d at 1353. First, courts look to the "language and structure of the statute." *Id.* More specifically, they presume that a "narrow proviso" to a "more general" offense is more likely to be an affirmative defense and that where one can omit the exception without "doing violence" to the definition of the offense, the exception is again more likely to be an affirmative defense. *Id.* Second, courts look to legislative history. *Id.* And third, courts determine whether the government or the defendant is "better situated to adduce evidence tending to prove or disprove the applicability of the exception." *Id.*

---

[2] The government argues that the definition of interception in § 2510(4) cabins the scope of § 2511(1)(a) by requiring that the interception be done through a "device" that is not used in the "ordinary course of business." *See* Gov't Resp. to Mot. to Dismiss Indictment at 7–9. That only compounds the vagueness problem. First, none of the cases the government cites for this proposition involve accessing a website on the public internet using the "device" of a web browser. Second, "ordinary course of business" is undefined and using that as the limiting factor for § 2511(1)(a) would still confer vast discretion on the government to determine its meaning.

Each of these prongs supports the conclusion that the readily accessible exception is an essential element, but the first bears particular emphasis. Crucially, a carve-out for readily accessible communications on the public internet is far from a "narrow" proviso. On the contrary, the entire architecture of the internet is designed around facilitating public access to the information that its users host. To be sure, that information can be protected from general access through passwords and other express restrictions, but a vast amount of information on the internet is publicly accessible to any internet user. And, for that reason, it is crucially "important in cases concerning electronic communications available through the Web for a plaintiff to demonstrate that those communications are not readily accessible," because public accessibility is the rule, not the exception. *Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1321 (11th Cir. 2006); *see also hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1201 (9th Cir. 2022) (warning that extension of Computer Fraud and Abuse Act to scraping public information online risks turning a "criminal hacking statute into a sweeping Internet-policing mandate" (internal citation omitted)).

Indeed, that is precisely why to read the readily-accessible exception as an affirmative defense would do "violence" to the definition of the offense. The plain text of § 2511(1)(a) can be read to criminalize the intentional interception of any electronic communication on the public internet. In that sense, § 2511(1)(a) of the Wiretap Act is indistinguishable from the Controlled Substances Act in *Outler*, which *McArthur* relied on in articulating the "do violence" analysis. 108 F.3d at

10

1353.  There, as here, the textual description of the offense did not include an exception or reference to an exception.  The question before the court was whether the government had to plead as an essential element that the prescription of a controlled substance was not for a "legitimate medical reason."[3]  Finding in the affirmative, the Fifth Circuit reasoned that Congress could not have meant to create a "presumption that every physician who prescribes a drug does so without a legitimate medical reason."  *Outler*, 659 F.2d at 1309 n.3.  Put another way, the Fifth Circuit determined that acting "without a legitimate medical reason . . . embodies the culpability of the offense" and therefore must be an essential element.  *Id.* at 1309–10.  The same is true here.  For a privacy statute like the Wiretap Act, culpability rests on the intercepted communication not being readily accessible to the public, and therefore requires that inaccessibility be an essential element.  *Cf. id.* at 1309 ("Without behavior beyond professional practice, there is no crime.").  Under the government's theory, however, all of the routine newsgathering detailed in the previous section could provide the predicate for an investigation and basis for an indictment, leaving journalists to establish the lawfulness of their conduct at trial.

---

[3] Strikingly, in *Outler*, the "legitimate medical reason" exception wasn't even included by Congress in the text of the statute.  The Supreme Court, in *United States v. Moore*, 423 U.S. 122, 141 (1975), determined that "the element of behavior beyond professional practice" was "implicit" in the offense because otherwise the definition of the offense would be unworkable.  *Outler*, 659 F.2d at 1309.

Legislative history, the second *McArthur* prong, likewise supports that
conclusion. As the Senate put it in explaining the extension the Wiretap Act's
protections to electronic communications, the use of the term "configure" in the
exception reflects an intention "to establish an *objective* standard of design
configuration for determining whether a system receives privacy protection,"
meaning that the subjective desire or intent of the system owner vis-à-vis access is
irrelevant. S. Rep. No. 99-541, at 18 (1986) (emphasis added). The House report is
even more explicit and refers to the growth of electronic bulletin boards, a context
that is directly relevant to accessing electronic communications over the internet. It
explains that a bulletin board user could "reasonably conclude" that a posting is
readily accessible to the public if the "means of access are widely known" and the
user does not "encounter any warnings, encryptions, password requests, or other
indicia of intended privacy." H.R. Rep. No. 99-647, at 62.[4] The throughline in the
legislative history is that Congress contemplated a broad exception from a narrow
prohibition. And, with the evolution of the modern internet and the migration of so
much journalism online, adherence to Congress's desired framework, which carves
out the "interception" of publicly accessible electronic communications from the
Wiretap Act, becomes even more important.

---

[4] One should not read the phrase "means of access are widely known" to suggest
that using complex but publicly available URLs as a security measure (i.e., "link
obscurity") means that an obscured URL is not "readily accessible." Indeed, the
"means of access" to an obscure URL are "widely known" – one accesses it on the
public internet via one's web browser of choice.

12

Finally, third, courts look to whether the prosecution or defense is better situated to adduce evidence regarding the exception. Practically, as in *McArthur*, both parties will have this information. Because the approach to public accessibility is an objective one, the government will know, through its investigation, whether the system's owner configured it to permit public access. And the defendant will be able to testify as to whether they encountered an access gate. But, legally, basic First Amendment vagueness doctrine requires that the readily-accessible exception be construed as an essential element. As described above, journalists of all stripes, and especially data journalists, will face deep uncertainty on which online conduct could draw a federal investigation and possibly an indictment. They will face an incentive to steer far wider than the no-go zone and a disincentive to engage in constitutionally protected activity. And that dynamic counsels in favor of treating the readily-accessible exception as an essential element of the § 2511(1)(a) offense.

## CONCLUSION

For these reasons, amicus respectfully urges the Court to grant Defendant's Motion to Dismiss.

DATED: June 27, 2025                    Respectfully submitted,

                                        _/s/ Gabe Rottman_
                                        Gabe Rottman (_pro hac vice_)
                                          _Counsel of Record_
                                        Mara Gassmann*
                                        REPORTERS COMMITTEE FOR
                                          FREEDOM OF THE PRESS
                                        1156 15th St. NW, Suite 1020
                                        Washington, D.C. 20005
                                        Telephone: (202) 795-9300
                                        grottman@rcfp.org

                                        _Counsel for Amicus Curiae_

                                        * _Of Counsel_

14