IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,
Plaintiff,
vs
TIMOTHY BURKE,
Defendant.

Criminal Docket No. 8:24-cr-68-KKM-TGW-1

**TRANSCRIPT OF MOTION FOR PROTECTIVE ORDER**

Heard in Courtroom 12A
Sam M. Gibbons United States Courthouse
801 North Florida Avenue
Tampa, Florida 33602
June 27, 2024 - Thursday
2:36 p.m. - 3:59 p.m.

**BEFORE THE HONORABLE THOMAS G. WILSON**
**UNITED STATES MAGISTRATE JUDGE**

LORI ANN CECIL VOLLMER, CSR, RPR
Federal Official Court Reporter
Sam M. Gibbons United States Courthouse
801 North Florida Avenue, Room 1221
Tampa, Florida 33602
Lori_CecilVollmer@flmd.uscourts.gov
(813) 301-5336

Proceedings transcribed via courtroom digital audio recording by a court reporter using computer-assisted transcription.

APPEARANCES

PRESENT ON BEHALF OF THE PLAINTIFF,
THE UNITED STATES OF AMERICA:

MR. ADAM DUSO and
MR. JAY G. TREZEVANT,
UNITED STATES ATTORNEY'S OFFICE
400 North Tampa Street
Suite 3200
Tampa, Florida 33602-4798
(813) 274-6000
adam.duso@usdoj.gov
jay.trezevant@usdoj.gov

PRESENT ON BEHALF OF THE DEFENDANT,
TIMOTHY BURKE:

MR. MICHAEL P. MADDUX,
MICHAEL P. MADDUX, PA
2102 West Cleveland Street
Tampa, Florida 33606
(813) 253-3363
mmaddux@madduxattorneys.com

MR. MARK D. RASCH,
LAW OFFICE OF MARK D. RASCH
7919 Springer Road
Bethesda, Maryland 20817
(301) 547-6925
mdrasch@gmail.com

PROCEEDINGS

(Open court.)

(Defendant present.)

(Court called to order.)

COURT SECURITY OFFICER: This Honorable Court is now in session. The Honorable Thomas G. Wilson presiding.

Please be seated.

THE COURT: This is a proceeding in ***Case No. 8:24-cr-68-KKM-TGW, United States versus Timothy Burke***.

In this case, there has been a motion for entry of a protective order, which is opposed.

I have read all the memoranda in these cases -- in this case. I've looked at all the exhibits except for the stuff that was just filed in violation of my rule that you have to file everything by 4:00 o'clock the day before a hearing. So although I glanced at it, I'm discounting that. So that's where I am.

So, Mr. Trezevant, you may proceed.

MR. TREZEVANT: Thank you, your Honor.

Essentially, from the government's perspective, this all arises obviously from an indictment returned by a Grand Jury about a finding of probable cause. It charges violations of the Computer, Fraud and Abuse Act and the Wiretap Act.

And within the indictment, it specifies out --

THE COURT: I read the indictment.

MR. TREZEVANT: -- the --

THE COURT: I've also read indictment.

MR. TREZEVANT: Yes, sir.

THE COURT: I've read everything in this case.

MR. TREZEVANT: So it -- it -- it -- in essence, okay.

Your Honor, then skipping forward, there are essentially several buckets of information that we secured during the investigation, which we go through in the documents. The only thing that's not probably completely fleshed out in -- in -- in the documents, and that's -- it's -- it's a little bit complex, but not incredibly so, and that is in the three buckets, there's a bucket of PII, there's a bucket of the intellectual property of -- of victims and of others that was produced pursuant to subpoena or otherwise to us, and then the bucket of the fruits of the contraband, which are largely found in Mr. Burke's web system after the May 2023 search.

So that bucket is unusual in that we met with the defense and -- and everybody, I believe, is in agreement, the defense is hoping to secure a copy of a forensically sound duplicate of that system as it existed at Mr. Burke's on the date of the search for its investigation in preparation for trial.

That system, it's -- it's not so easy as a computer and a hard drive. That system used what's called a RAID array -- that's R-A-I-D -- which stands for Redundant Array of Independent Discs and Drives.

Essentially, what it is, Judge, is it cobbles together a collection of disks and drives to create essentially one system with nothing necessarily being saved on any particular device or drive, but collectively being saved. So it can't be broken apart into individual files.

You -- you can -- you can take that system and download individual files, but if you want to have a forensic copy that you're going to look at and review and study, you need the whole thing intact so that -- our -- our situation is in order to make that available to the defense, our concern is when we make it available to the defense, it's only that Mr. Burke, the defendant who is actually charged with stealing it in the first place, not be allowed unfettered access to it because he was the one charged with stealing it.

And -- and -- and obviously the victim entities are concerned he could have it again. He has indicated through his attorneys that he believes he has the right to send it out into the public, any of the information, frankly, in discovery.

And so because of that, we don't believe we are

able to produce it without a protective order saying he can have access to it with his attorneys' supervision, but he should not have unfettered -- being the person charged with actually stealing it in the first place or illegally intercepting it in the first place, he should not have unfettered access to that information going forward without some supervision and monitoring by counsel. That's our -- that's essentially where we're coming from.

THE COURT: Okay. What says the defendant?

MR. MADDUX: Good afternoon, your Honor.

Michael Maddux representing Mr. Burke, who is present. Also here is Mr. Rasch, my co-counsel, and he's appearing pro hoc under 532.

THE COURT: All right.

MR. MADDUX: He'll be arguing, your Honor. Thank you.

MR. RASCH: Thank you, your Honor.

So counsel for the government is correct in that there are several buckets of information that present different issues.

With respect to the issues about PII, personally identifiable information and sensitive information, and the -- like, our objection to the protective order is that there is no specificity.

We obviously --

THE COURT: Okay. So let me -- and I understand that's your position.

So but you get to see it. You know what it is. So if you have any complaint or any objection that something shouldn't be protected, then you can file an objection because you know what it is. This is unlike a -- some situation of attorney/client privilege where the other party doesn't know what's involved. You know what's involved.

And if you think that there's something that's being protected, that doesn't deserve it, then you can file a specific objection to that and I'll let them then file a response to that and that's what -- how we'll go.

MR. RASCH: All right. So the general rule on discovery is, aside from Rule 49.1 material --

THE COURT: I'm just telling you that's -- that's the rule I'm going to impose right now.

MR. RASCH: So, your Honor, we have no idea what the government thinks is a trade secret. We have no idea what the government thinks is copyrighted material. We have no idea --

THE COURT: Okay. But --

MR. RASCH: -- and we can't --

THE COURT: -- if you don't know --

MR. RASCH: -- tell --

THE COURT: -- if you don't know and you don't think there's any basis for objection, then don't object because you're going to be -- because the point is you guys are going to be really wasting a whole lot of time on not much. That -- that's my impression. And if you want to waste your time, that's your business, but I don't want it to be wasting my time because then that's my business.

MR. RASCH: All we're asking is that the -- that the government specify what specific files and information it wants to protect and we may --

THE COURT: No, they say -- they've -- they've got two categories, it seems to me, shouldn't even be an issue. Personal identification information, that's customarily protected.

And the other category is trade secrets that were -- or information that was obtained from third parties that they have objected to being disclosed. So we have the third party information, we have the personal identification information. There shouldn't be any issue about that.

MR. RASCH: Absolutely, there should be.

Your Honor, the very reason --

THE COURT: Well, there shouldn't be.

MR. RASCH: But here's the --

THE COURT: But if you're making it one, go ahead and tell me why.

MR. RASCH: But the personally indenti- -- well, first of all, there's a practical concern, which I'll address second.

But the personally identifiable information is names, addresses, phone numbers of people that are on Mr. Burke's computer that was seized by the government. Under their rule, he can't use it to call them, contact them because it's all subject to a protective order. This is his own stuff.

THE COURT: Why would he be calling them?

MR. RASCH: They're witne- -- these are people on his own computer, names of people on his own --

THE COURT: Okay.

MR. RASCH: -- computer.

THE COURT: Then you file some objection I need to call this person because he's going to be a witness.

MR. RASCH: That's part of the -- we can't just telephone -- it -- it -- it places the burden on the defendant --

THE COURT: Yes, it does.

MR. RASCH: -- to demonstrate that materials that were seized from his newsroom are allowed --

THE COURT: That he, as --

MR. RASCH: -- to be published.

THE COURT: -- the government has pointed out,

that he inappropriately obtained.

MR. RASCH: No. This doesn't apply only to that. It's everything on his computer. It's not the stuff that was inappropriately obtained. This is everything that his PII -- any information --

THE COURT: Okay.

MR. RASCH: It would prohibit him from -- from disclosing --

THE COURT: You're not supposed to --

MR. RASCH: -- his own medical records.

THE COURT: -- you're not supposed to publish personal identification information. That -- the law protects that.

MR. RASCH: No, it doesn't. We see it all the time in the newspaper. Newspapers publish personal info- -- names of victims, names of witnesses.

THE COURT: But when it comes to the Court and it's covered by the Court's documents, then --

MR. RASCH: That is correct.

THE COURT: -- it's protected.

MR. RASCH: Yes. And we -- we clearly will not disclose any information under Rule 49.1.

What this does is it basically says all discovery is prohibited from use unless we get the permission of the Court or of the -- of the United States.

THE COURT: That -- that isn't what it's saying. It's saying in the first place, you cannot publish the personal identification information, period, because the law says don't do that because we sanitize these things all over the place. It becomes a real burden to us. So that's what we do and I'm going to continue to protect it because that's what the law says. So the personal identification information shouldn't even be an issue. You may think it is, but I don't.

MR. RASCH: If it's -- if it's personal information that the government provides, like, in the 302 or in an FBI report, absolutely.

If this is personal information that predated the search warrant that was lawfully obtained by Mr. Burke and happens to be --

THE COURT: Well, I think there's some -- wasn't there some cutoff date on this of, what, February of 2022 or something like that?

MR. RASCH: The --

THE COURT: I thought I saw something in all the stuff I was reading that -- that there's some indication that there was -- the only thing that the protective order would cover were things after that date. I think it's February of 2022.

MR. RASCH: Well, your Honor, these are his own

files. They were seized by the government. A fraction of them are -- are relevant to the case. Okay? This is stuff that is on his computer. All right?

Now, we have trade secrets, which apparently are in the possession of the government. Okay? And we have no way of knowing whether something is or is not a trade secret. All we're asking is that the government designate this is a trade secret, copyrighted information.

THE COURT: No. I'm going to put the burden on you. The burden on you is if the stuff that they obtained from these third parties, and I've seen -- because I've looked at everything in the file. The parties have said, hey, don't disclose this. We're giving you this pursuant to the subpoena, but we don't want this stuff disclosed.

MR. RASCH: We've never seen anything like that. We have never seen a subpoena response from a -- from an entity --

THE COURT: I did.

MR. RASCH: -- that -- we never received a subpoena from the government where they -- they said -- they asked for -- where the movant asked for a protective order. All we have seen is a protective order request from the government.

THE COURT: Well, I've seen -- I've seen a letter from somebody in response to something saying, hey, okay,

we're complying with a subpoena. Here's what the stuff is, but we don't want this disclosed.

MR. TREZEVANT: Yes, sir. That was in the exhibits we filed with the Court for this hearing and that letter was made available -- all of that stuff was made available for defense to go look at at the FBI.

MR. RASCH: It wasn't made available to me. Well, then, your Honor, the movant is the party that doesn't want it disclosed. If I -- if I give something to somebody unrestricted and say I don't want it disclosed, they need to meet the burden of showing that it shouldn't be disclosed.

THE COURT: You mean the third parties need to come in?

MR. RASCH: That's correct.

THE COURT: Well, that isn't gonna happen. That's too much of a burden on them. It's unfair because they've responded to a subpoena from the government. And so if you think there's stuff in there that isn't -- now, we're talking about Category 2 under the government's thing -- that it's trade secret. If you don't think it's trade secret, say we don't think it's trade secret and say why. That's all.

MR. RASCH: So -- so the Court's ruling basically is going to be that the defense has got to disclose to the Court, I assume in camera and under seal, what it wants access to because that would be our work product.

THE COURT: Yeah.

MR. RASCH: So we would file a petition with the Court to unseal categories in camera ex parte?

THE COURT: Specific -- specific items, not just say we want all of the -- Category 1 or Category 2 disclosed.

MR. RASCH: So --

THE COURT: We want particular items disclosed because here's this witness that we have his telephone number, but we want to call him as a witness and we need to call him, something like that, if that's what your problem is.

MR. RASCH: Well -- all right. So thousands of emails have email addresses. All right? Every email address -- the problem we have here is this, the government has taken the position that personally identifiable information or private information includes the name Fox News.

THE COURT: Well --

MR. RASCH: Yes. Or --

THE COURT: So they were --

MR. RASCH: -- the name Kanye --

THE COURT: -- they were thinking it had --

MR. RASCH: -- West --

THE COURT: -- a --

(Simultaneous cross-talk making testimony unintelligible.)

THE COURT: I mean, why would Fox News be --

MR. TREZEVANT: I don't -- I don't know.

THE COURT: That's not personal --

MR. TREZEVANT: And -- and, your Honor --

THE COURT: -- information.

MR. TREZEVANT: And we're not -- no one is suggesting -- and we haven't. It's not in the protective order, it's not in our filing, it's not in our motion that he can't look and get a phone number and call someone. It's he can't publish it out into the -- he can't publish this information.

THE COURT: Well, there's -- the category of personal protected information is protecting and -- and the law protects it. And we -- as I say, we go through all kind of problems to sanitize these things to make sure nothing is produced that has that information. So that's the bottom line. That stuff is not going to be made available so that --

MR. TREZEVANT: And, your Honor, the trade -- the intellectual property, a lot of it is what's contained within logs, system logs produced to the United States that we've made available to the defense and they declined to look at, but it's been there for -- for months.

Since we sent our first discovery letter, we let them know it was available at the FBI to go look at and they declined to do that.

But setting that aside, when they get it, no one is saying they can't look at it. We're just saying --

THE COURT: It doesn't say that.

MR. TREZEVANT: Yeah.

MR. RASCH: What we're saying is we don't -- the reason we declined to look at this material is because they -- the mechanism, we want just a copy of it made so that we can make use of it. We are not going to be disclosing people's phone numbers to the public.

THE COURT: The way your -- your memo reads is you want it so you can publish it, publish all that stuff.

MR. RASCH: What we're --

THE COURT: That's the import of what you have presented.

MR. RASCH: Well, no. We don't -- we said -- we wrote two separate memoranda.

One deals with the --

THE COURT: Yeah, I know.

MR. RASCH: -- personally identifiable information and --

THE COURT: And there's no reason to have two separate memos.

MR. RASCH: Well, what we're talking about is -- when we're talking about personally identifiable information, trade secrets, all we ask is that the Court -- that the government identify what they are --

THE COURT: No. I'm going to -- I've already said how I'm going to approach it. If you think there's some personal identification -- identifiable information that you need to get and it's covered by the protective order, then you can object to it and then the government can respond to that objection and then I'll rule on it.

MR. RASCH: Well --

THE COURT: It's that simple.

MR. RASCH: -- since it also includes copyrighted information, every email that he's written has a copyright. Every -- everything that is a unique expression --

THE COURT: I don't care about everything he's written in his lifetime. In the first place, it only goes back, as I recall, to February of 2022, isn't that right?

MR. RASCH: I think so, yes.

MR. TREZEVANT: Through May -- through May '23, yes, sir.

MR. RASCH: So every chat he's written, every -- every text message, those are all copyrighted as -- as --

THE COURT: I'm not talking about that stuff.

MR. RASCH: He said everything that's copyrighted.

I can't tell --

THE COURT: It said -- where did you say that?

MR. TREZEVANT: I haven't.

MR. RASCH: He's asked --

THE COURT: You're making it up.

MR. RASCH: -- for the protective order to prevent him disclosing any copyrighted information.

THE COURT: That isn't part of the protective order.

MR. TREZEVANT: No, sir.

We're not enforcing other people's copyrights. We're just saying that a protective order -- so that the defendant -- so the defense attorneys and their team can look at everything.

THE COURT: Right, yes. That's the bottom line. You get to see everything so that you can then make an objection if there's something that's being unreasonably withheld and then they can respond to that objection.

MR. TREZEVANT: And then under Paragraph 5 of the proposed order, your Honor, to the extent they see something and they say, hey, we don't think this falls within the -- it should fall within the protective order, under that, they would -- we would confer and if we agree, we'd agree and then we could notify the Court or take some action after that.

But first, they'd say, you know, this doesn't seem to fit and we would likely, frankly, if it's obvious, agree

because why wouldn't we? That's, you know --

THE COURT: Yeah. So anyway, that's the approach I'm going to take.

MR. RASCH: Well, they did ask for -- to protect copyrighted information as well.

Our problem is this --

THE COURT: Where do they say that?

MR. RASCH: In -- in their motion. They said that there was copyrighted information that they wanted as well as trade secrets. I'll have to find the page.

MR. TREZEVANT: It was the -- the -- it's that third parties have produced information to us.

THE COURT: Well, that's a different -- we're not talking about that category today.

MR. TREZEVANT: That's right.

THE COURT: We're talking about the first two categories.

MR. TREZEVANT: Right.

THE COURT: The first category is personal identification information that the law protects and we sanitize all the time. So I'm -- I'm -- I'm protecting that.

If there's some particular problem with something that's being withheld, then you can file an objection, but I don't see that you're going to have a problem getting

addresses and telephone numbers for a potential witness. That's not going to happen.

MR. RASCH: Well, then what I'll -- I'll petition the Court for each individual prot- -- every internet protocol address, which is personally identifiable information and --

THE COURT: Yeah, yeah, yeah. And if you're going to do that, then I may end up imposing sanctions for frivolous claims.

MR. RASCH: No, if we want to use it --

THE COURT: Oh, if you want to use it?

MR. RASCH: -- to --

(Simultaneous cross-talk making testimony unintelligible.)

THE COURT: Use it to do what? Use it to do what? Because it's -- because it's clear that -- what I get out of your memo is you want to publish this stuff.

MR. RASCH: We want to make use of it.

THE COURT: No, you want to publish this stuff. That's the import of your memo.

MR. RASCH: What we want to publish --

THE COURT: Or memos.

MR. RASCH: What we want to publish, your Honor, and what Mr. Burke has a right to publish is the materials that he collected for dissemination to the public, his reportage. So the government has done an effective --

THE COURT: Including the information that's personal identification information?

MR. RASCH: Yes.

THE COURT: Okay. Well, he can't.

MR. RASCH: So the Court is ruling that a reporter does not have the right --

THE COURT: Yes.

MR. RASCH: -- to publish --

THE COURT: Forget the reporter. He's a criminal defendant who is accused of stealing information and hacking into computers.

MR. RASCH: He is.

THE COURT: Okay.

MR. RASCH: He's also a reporter and this order --

THE COURT: Forget -- I'm discounting the reporter stuff that you've been heavily relying upon. That's not his status in this case.

MR. RASCH: So these are materials -- any order that restricts the publication of information is a prior restraint --

THE COURT: I understand that --

MR. RASCH: -- on publishing --

THE COURT: -- that's your argument. I reject it.

MR. RASCH: So --

THE COURT: There's criminal rules about limiting

disclosure of information and I'm applying those rules.

MR. RASCH: The criminal rules do not restrict this. The Court -- the -- the government has asked for an injunction that is actually --

THE COURT: They don't ask for an injunction.

MR. RASCH: -- beyond Rule 16.

THE COURT: They asked for a protective order.

MR. RASCH: That is what a protective order is, an --

THE COURT: Well, I know you can --

MR. RASCH: -- injunction against disclosure.

THE COURT: -- you -- you've morphed it into that. You've made that argument. I'm not buying it.

MR. RASCH: The Court is saying --

THE COURT: The fact that he is a reporter --

MR. RASCH: Yes.

THE COURT: -- doesn't override the fact that there are rules in criminal discovery of what you can produce or what you can publish and what you can't and I'm relying upon the criminal rules to limit what can be published.

MR. RASCH: So in the Pentagon Papers --

THE COURT: He cannot publish personal private information -- personal publication. I mean, he can't do it. The law says you can't.

And as I've been saying, we go to great lengths

at really a burden to make sure that there's no personal private information that's being disclosed.

MR. RASCH: Journalists publish personal information all the time.

THE COURT: Yes.

MR. RASCH: However --

THE COURT: But -- but not contrary to the law and --

MR. RASCH: That's correct.

THE COURT: -- we're talking about stuff that's now under the protection of the Court.

MR. RASCH: So --

THE COURT: Forget the journalist stuff. That's going nowhere as far as I'm concerned. I reject that notion. He's a criminal defendant charged with stealing information.

MR. RASCH: So if the government were to have searched and seized the Washington Post and the New York Times and the New York Times --

THE COURT: That isn't what they did.

MR. RASCH: If -- they didn't.

THE COURT: They didn't.

MR. RASCH: They -- they sought it. It turned out the Attorney General refused to do it, but they -- the government sought such a warrant.

THE COURT: In this case?

MR. RASCH: No, in *United States versus New York Times*.

THE COURT: No, we're not talking about those other cases. I reject those as inapposite. I'm not buying that argument. I saw it, I read it, I understood it, I reject it. So that's where I am on that point.

MR. RASCH: So just to be clear then, the Court --

THE COURT: That's as clear as I can get.

MR. RASCH: -- is granting a protective order, okay, protecting -- we don't know what -- what is protected by the protective order. We can't tell what is -- and so basically we have --

THE COURT: Okay. And here's the point. If you have a question about it, first you can go ask Mr. Trezevant. And if he says, yeah, it is protected and you think it shouldn't be, then you can file some motion with the Court asking for it not to be protected. It's that simple.

MR. RASCH: Now, the live streams, I want to address the live streams.

The Court has found --

THE COURT: The what?

MR. RASCH: The live streams, the videos that he had.

Mr. Burke --

THE COURT: Well, as far as -- there are only

two videos, right?

MR. TREZEVANT: No, there are thousands.

MR. RASCH: Thousands of live stream videos. This is how he reports. He collects live stream videos, finds newsworthy information on it and then he publishes that as newsworthy content.

THE COURT: Okay.

MR. RASCH: He's been doing this for years, Mr. Burke. That is his business. That has been his business for years. He's -- he's made --

THE COURT: Well, what's the problem with that stuff?

MR. RASCH: The government wanted -- the government is treating that as contraband and they're saying that he cannot publish these live streams.

THE COURT: Well, we're not talking about -- we're not talking about that category yet.

MR. RASCH: Okay.

THE COURT: At this point I'm still focusing on the first two categories that seems to me shouldn't be any real problem.

MR. RASCH: Your Honor --

THE COURT: If it's personal identification information, the law says you can't produce it.

The second category is potentially trade secret

that they got from third parties who have asked that this stuff be kept confidential. I'm prepared to go along with that.

MR. RASCH: Only if --

THE COURT: And that's if you --

MR. RASCH: -- it's --

THE COURT: Well, wait. And -- and if you think there's some of that stuff in that second category that doesn't deserve any kind of protection, I'm prepared to consider it because I'm aware that parties regularly complain that something should be protected and I regularly overrule those objections.

So if you think there's something in Category 2 that isn't deserving of protection, then you can file a motion saying I want to -- well, I want this.

MR. RASCH: I promise we don't know what's in Category 2. We don't know.

THE COURT: It's -- well, you've got it all. You've got it all. That's the point. This is not a case, like -- like attorney/client privilege where some side didn't know the other side -- what the side has. Here, you've got it. You see it. You get to see it.

MR. RASCH: But we don't know what's a trade secret and what's not.

THE COURT: Well, then figure it out.

MR. RASCH: Well, we'd go to the government and say what do you think is a trade secret and they would say this is what we think is a trade secret. That's what we're asking them to do. Tell us what they think is a trade secret.

THE COURT: Okay. And if you think there's some problem, then do that. It's that simple.

MR. RASCH: That puts the burden on us to try to figure out --

THE COURT: Yes, there --

MR. RASCH: -- what is or is not --

THE COURT: -- is a burden on --

MR. RASCH: -- a trade secret.

THE COURT: -- you. You're a defendant in a criminal case because he is charged with criminal acts. So there's a burden on that point.

MR. RASCH: Well, I will tell you there's no way we can look at a document and know for a fact or even know whether it's a trade secret or not. We can't.

THE COURT: You don't have any clue?

MR. RASCH: No.

THE COURT: Okay.

MR. RASCH: The nature of a trade secret is that it has to have -- it has to be confidential, be kept confidential, obtain economic value by virtue of the fact

that it's confidential, it has to have not been disclosed in a manner to a third party in a manner in which it would be -- it's like privilege where it's confi- -- no longer confidential. You can't look at a document and know that.

THE COURT: You can have some idea of whether or not it looks like it's a trade secret and then you could ask the government about it. You can tell a whole lot of this stuff is junk. Nobody cares. If you put all of these documents on the courthouse steps, nobody would pick it up because nobody would care. So you're telling me that you can't tell by looking at something whether it might be a trade secret or not?

MR. RASCH: All we're asking the Court -- the -- the government to do is say these files contain --

THE COURT: Okay. No.

MR. RASCH: -- trade secrets.

THE COURT: No. I don't buy that. I think that you're brighter than that. You've articulated the elements of a trade secret. So I'm thinking the second category, that even -- shouldn't even be discussed.

MR. RASCH: Customer lists are trade secrets.

THE COURT: Yes, they are. They can be.

And so --

MR. RASCH: Or they cannot be. We -- we have no way of knowing whether something is a trade secret based

on the discovery.

THE COURT: Okay. Well, then you're out of luck.

MR. RASCH: Okay.

THE COURT: If you can't figure it out, then that's just too bad because I think -- I'm not believing that you can't figure it out. I think you can and if you have any issue with it, then you talk to the government. And if they say, yeah, we think this is a trade secret or we've got some kind of confidentiality letter from a defendant -- from the subpoenaed party, then -- then we can discuss it. But I'm not buying your notion that you can't figure it out.

So as far as I'm concerned, Categories 1 and 2, you're going to have to take that approach, that if you think something is maybe protected, discuss it with the government. If the government says it is and you don't agree with them, you file a motion and the government can file a response. That's how we'll do it.

MR. RASCH: There's practical concern as well and that is that we will have to send -- we will have to go down to the FBI offices to do the discovery. We will not be allowed to take anything out of the offices. It's much easier if we could agree on what materials they want to protect and make a copy --

THE COURT: That isn't gonna happen. It isn't gonna happen. I know that's what you want. You want to put the

burden on them. I'm not going to do that.

MR. RASCH: Your Honor --

THE COURT: Because I think you can -- on those two categories, you can figure it out and if you have any problem, file an objection.

MR. TREZEVANT: And, your Honor, we've -- we are agreeing under the proposed process and the reason we have the protective order here in the first place --

THE COURT: I'll just add -- sorry to interrupt.

I just -- this is a common thing that we do all the time. I just did one last week. So the -- the notion that this protective order should be a big issue, I don't understand it.

MR. RASCH: It -- it is common, your Honor, for -- for a movant to say these documents are trade secrets, I want a protective order on them.

What is not common is to say here's 20 terabytes of data. Included in there are some trade secrets. I want a protective order on everything.

THE COURT: I just signed one last week. There wasn't any issue. It was unopposed because it just -- it shouldn't be opposed. That's that. It shouldn't be an issue.

MR. RASCH: But as a -- as a practical matter, they're going to give us access to thousands of documents, say you figure out what's a trade secret and don't use it.

THE COURT: Yeah, right.

MR. RASCH: I don't -- as opposed to saying here's trade secrets, we want this protected. It is highly likely if the government would give us a list of what it thought was trade secrets, we would say we agree. We have no intention of using it. The same thing is true with personally identifiable information.

MR. TREZEVANT: And, your Honor, we gave them a list of items that we secured per -- at least per the subpoena items. And if I turn it around, the Court can look. Our attachment made the highlighted items, the yellow highlighted items, with Bates stamp numbers, which are the ones that we believe should fall under the protection order. The white ones are the ones we've already sent to them they've got in their possession. We've done that.

MR. RASCH: So they're seeking a protective order only for the yellow highlighted materials, is that correct?

MR. TREZEVANT: Yeah.

THE COURT: Well, I can't put that in the order.

MR. RASCH: No, but we can -- we can attach that as an exhibit.

MR. TREZEVANT: Judge, that -- we told that to them. It's in our letter and the yellow highlighted items are the ones that we believe need protection and should fall underneath the protective order and we have produced to them

the others that we don't -- the items we've already produced to them, we believe they can have. Nobody is claiming it's PII.

THE COURT: They already have them?

MR. TREZEVANT: They've got them. They've got them.

THE COURT: Okay. How -- how many --

MR. TREZEVANT: One and two, as to Categories 1 and 2, yes.

THE COURT: Yeah. Right. Okay.

MR. RASCH: Now, we -- now, we have to address the issue of the -- the government has alleged that the materials that Mr. Burke stole is a list of websites, that he accessed the computer without authorization using a published password. We contend that it was a published password and that by means of doing so, obtained information, meaning a list of witnesses.

THE COURT: Right. And so -- see, I see this stuff all the time. On the dark web, people are selling usernames and passwords.

MR. RASCH: Correct.

THE COURT: Okay. And what my impression from what I've read is Mr. Burke bought something like that.

MR. TREZEVANT: Mr. Gaudino did, Judge.

MR. RASCH: Absolutely not, your Honor.

THE COURT: He did not?

MR. RASCH: No.
THE COURT: Oh, the other guy did. That's why he pled guilty.
MR. RASCH: No, no. Your Honor --
THE COURT: Okay.
MR. RASCH: -- the owner of the password published it on their own website. It remains to this day published on the internet archive of their website.
THE COURT: Okay. Well, then you have a good defense, right?
MR. RASCH: Yes.
THE COURT: Okay.
MR. RASCH: The problem is --
THE COURT: So go to trial and raise that defense.
MR. RASCH: The government's argument is that it can prevent publication of newsworthy materials based on an assertion --
THE COURT: Cut out we're talking about newsworthy materials. I'm objecting the notion that because he is a journalist, he could hack into people's computers.
MR. RASCH: I would agree he can't.
THE COURT: Okay.
MR. RASCH: He did not.
THE COURT: Okay.
MR. RASCH: He did not.

THE COURT: Well, then go to trial and try that issue.

MR. RASCH: So under this rationale, the government can prevent public -- prevent someone from publishing materials simply by asserting that they were obtained unlawfully?

THE COURT: No, by presenting to a Grand Jury and getting a finding of probable cause.

MR. RASCH: Well, first, they've got to find the probable cause from the magistrate. They seized the materials and held them for over a year -- for almost a year.

THE COURT: Okay.

MR. RASCH: And we could not publish them.

THE COURT: So there's probable cause.

MR. RASCH: That is precisely what they are not allowed to do under ***United States versus New York Times***.

THE COURT: That -- did you make any argument like that?

MR. RASCH: Yes. This is --

THE COURT: What happened to it?

MR. RASCH: -- precisely the argument that we have made.

THE COURT: What happened to that argument?

MR. RASCH: We filed a petition under Rule 41(g) before we got the affidavit. The government argued that we could not see the affidavit because it contained the names

of -- contained personal information, the names of witnesses, the names of victims. It did not. It contained not a single name of a witness, not a single name of --

THE COURT: Did you make an objection to suppress the search warrant in the search?

MR. RASCH: We have not yet filed that motion. That will be coming.

THE COURT: How long has this been dragging on?

MR. RASCH: Well, we've been involved in this discovery dispute for over a month now.

THE COURT: Isn't there some cutoff date for filing motions to suppress in this case?

MR. RASCH: July 1.

MR. TREZEVANT: Yeah. July 1, Judge.

THE COURT: What?

MR. TREZEVANT: Next week.

THE COURT: Okay. All right. Well, then you can pursue that.

MR. RASCH: But, your Honor, in -- in the interim what the Court's order does is have the practical and legal affect as acting as a prior restraint on publication.

THE COURT: No, it doesn't. I rejected that argument. I'm not buying it. Forget it.

MR. RASCH: Either the --

THE COURT: This stuff is -- now, if you get

it suppressed, you're in good shape. But if you don't get it suppressed, then the conclusion is that he improperly hacked into somebody's computer and obtained information that he wasn't entitled to get. You can't publish that as a journalist because then you shouldn't have it in the first place.

MR. RASCH: Well, that -- that's the ***New York Times*** case. The argument was that --

THE COURT: I don't --

MR. RASCH: -- they obtained --

THE COURT: -- care --

MR. RASCH: -- illegally --

THE COURT: -- if that -- no, that isn't the ***New York Times*** case. You're saying it is. You're trying to convert this case into one of those other cases. It isn't that.

This is a case where he, in cahoots with some other guy who has already pled guilty, has obtained information that he got from hacking into somebody's computer.

MR. RASCH: That he is alleged to have -- well, there's two kinds of -- the -- the -- the live streams were not alleged to have been obtained by hacking. The live streams in the indictment are alleged to have been obtained by -- that he acquired the contents of the communications without the consent of the parties. All right? That's

it.

The federal interception law makes it illegal to acquire the contents on an electronic communication. It doesn't require hacking at all. The government is asserting --

THE COURT: No, but that's how it occurred.

MR. RASCH: No.

THE COURT: Oh, it isn't?

MR. RASCH: No.

THE COURT: He didn't --

MR. RASCH: Not even in the indictment and not even in the affidavit --

THE COURT: Isn't --

MR. RASCH: -- in support of the search warrant.

THE COURT: -- that what happened?

MR. RASCH: The government is asserting that he put web page addresses -- put them into a browser, found these -- found these videos, that those web page addresses were secret or hidden and that he shouldn't have known those.

Now, under the federal statute, if it is configured to be readily accessible to the public, that's an element of the crime. It's not in the indictment. In order for it to be illegal --

THE COURT: Well, I'm not here to decide whether this is a good indictment or not. You can raise that before the district judge. So discounting that argument. That

doesn't make any difference here.

MR. RASCH: But the Court is ruling that he cannot publish these materials because they are obtained illegally.

THE COURT: That's the allegation.

MR. RASCH: That's correct.

THE COURT: And the -- and a Grand Jury has agreed with that.

MR. RASCH: However, the indictment doesn't include elements of the offense and whether that will be part of --

THE COURT: Okay. That's a different story. Then go to the district judge and com- -- and get the indictment thrown out.

MR. RASCH: Fine. We -- we plan to.

THE COURT: Okay.

MR. RASCH: But at this point all we're saying is --

THE COURT: I'm assuming it's the same --

MR. RASCH: -- that we're requesting for --

THE COURT: -- July -- it's the same July cutoff date for indictments and motions to suppress.

MR. TREZEVANT: It is.

MR. RASCH: And what we're saying is we have not yet even seen the materials because we've been litigating this protective order.

MR. TREZEVANT: That's --

THE COURT: Well, you shouldn't have because --

MR. TREZEVANT: They were there for them to look at, Judge. They declined to.

THE COURT: Yeah. They --

MR. RASCH: I could --

THE COURT: -- could see -- you could -- you could see it all the time.

MR. RASCH: But we --

THE COURT: You --

MR. RASCH: -- wouldn't decline to be able to see it and to be able to utilize it without sitting over his shoulder and supervising him as he does so. We want the right to be able to use discovery materials the way discovery --

THE COURT: Yeah, but now you're complaining you couldn't --

MR. RASCH: -- is used all the time.

THE COURT: -- move forward because you didn't know what was involved. You could have known and you should have known and for all I know you did know what was involved.

MR. RASCH: We have no idea what -- what materials the government has. We don't know.

THE COURT: You didn't go look at the stuff?

MR. RASCH: No, your Honor.

Because the -- the government wanted a protective order where it got to decide what we could and could not

do with the materials.

THE COURT: That's not what it says.

MR. RASCH: Well, it -- it had -- it wanted to say we could not disclose the contents of these live streams.

THE COURT: Correct. All right.

MR. RASCH: Because --

THE COURT: Well, no, it's -- this is tailored to a standard protective order. As I said, I did one of these last week. So there's nothing unusual about this situation. It's a -- it's a form, I imagine, that they used for the protective order that they probably got from the Justice Department.

MR. RASCH: Your Honor, imagine a situation where the government alleges that the Washington Post committed a crime in collecting information.

THE COURT: I'm not talking about the Washington Post.

MR. RASCH: That's exactly what we have here.

THE COURT: No, it isn't, no. You're trying to make it something like that. I'm not buying that argument.

MR. RASCH: The crime here is publishing information. That's the crime. He is specifically charged with the crime of publishing information that was embarrassing to Fox News. He is specifically --

THE COURT: No, he isn't.

MR. RASCH: -- disclosing the contents of --
THE COURT: You're making this all up. There's nothing in the indictment that says anything like that.
MR. RASCH: No. The indictment doesn't mention Fox News at all. It doesn't mention the names of any of the companies nor does the affidavit in support of a warrant. None of these entities are mentioned.
THE COURT: Okay. Then what's the problem?
MR. RASCH: We've got -- the problem here is this. The crime he is charged with is disclosing the contents of information.
THE COURT: I don't think so.
MR. RASCH: That's publication. Yes.
THE COURT: It's disclosing?
MR. RASCH: Disclosing. That is the crime.
THE COURT: Well --
MR. RASCH: 18 USC Section 2511.
THE COURT: No, no. What -- what's the paragraph of the indictment?
MR. TREZEVANT: It's the last -- there are two substantive counts at the -- the last two substantive counts deal with his disclosure of wire communications illegally and unlawfully obtained by him.
THE COURT: This is a different -- this is the wiretap stuff?

MR. TREZEVANT: Yes.

THE COURT: Okay.

MR. RASCH: And this is the ***Bartnicki*** offense. The Supreme Court said in ***Bartnicki*** a journalist --

THE COURT: Forget the journalist. He's a defendant in a criminal case. He's --

MR. RASCH: So was ***Bartnicki***.

THE COURT: -- charged with -- he's charged with a criminal offense. I'm not buying that journalist stuff. I'm not -- he's not -- he does not have free rein to go stealing stuff or improperly using a wiretap to get information. He can't do that.

MR. RASCH: But he does not have a right to commit a violation of the law. The Supreme Court has said in ***Bartnicki*** that the First Amendment --

THE COURT: Well, you can take that all up. I'm not buying your argument on that stuff. I'm rejecting it. Those cases are inapposite to this particular case.

MR. RASCH: He has a Constitutional right to publish materials even that were unlawfully acquired. That was what ***Bartnicki*** held.

THE COURT: Okay. No -- no matter how he got it?

MR. RASCH: Yes, that's exactly right. Even if he knew that had been illegally obtained.

THE COURT: Okay.

MR. RASCH: What the Court did not address in ***Bartnicki*** is what I think the Court legitimately should consider here is whether or not -- where the reporter, the person disclosing it, is alleged to have participated in the offense. ***Bartnicki*** didn't address that issue, but ***Bartnicki*** did say the crime of disclosing the contents --

THE COURT: Well, here's the bottom line. If -- if you're right that this indictment is flawed because it doesn't charge a crime, then go to the district judge and make that argument.

MR. RASCH: But the Court is now basically saying that he cannot publish information the government has seized from him because the government has alleged that he committed the crime.

THE COURT: No, what I'm saying is I'm prepared to sign the standard protective order that I -- as I said, I signed one last week. It's a standard form. And so that's all. He's limited in that respect. You can see this stuff. he could see this stuff.

MR. RASCH: Well, it acts as a prior restraint on public information.

THE COURT: No, it doesn't. So I'm reject- -- I understand your argument. I reject it. You've stretched that argument way too far. So I'm not buying that.

So let's go to Category 3 because as far as

I'm concerned with respect to 1 and 2, I'm going to sign the protective order saying he can't get it because your goal is to publish this stuff.

Isn't that the goal?

MR. RASCH: To have the option to be able to do so, yes.

THE COURT: Okay. Well, you cannot publish personal identification information. You can't. The law says you can't. So that is out of it.

With respect to the second category, at times there's confidential information that needs to be and deserves to be protected. And at times I protect it and at times I don't. I get this issue all the time. In -- in civil cases, they regularly are complaining about I want to produce it or I don't want to produce it and I rule on it depending on what this stuff is.

And I agree that at times the companies are really overly stretching what is trade secrets or not -- just trade secrets, but what is confidential commercial information. They -- they regularly overdo that and I regularly reject it.

So if there's stuff in Category 2 that falls into that category, I'm prepared to reject any contention that you can't get it and you can't publish it because it's -- because it's -- I'll go back to if you put it on the courthouse steps, nobody would pick it up because it's so boring. Nobody is

interested in it. So if you get stuck in Category 2, I'm prepared to consider it. Sometimes I agree with the company, sometimes I don't.

MR. RASCH: We will go back to the categories in yellow on the spreadsheet and we will note specific objections to say specific information.

THE COURT: Okay. All right. Now, we're up to Category 3.

Anything further you want to say about that?

MR. RASCH: Well, Category 3 is what the government contends to be the fruits and instrumentalities of -- of the crime. All right? Which -- which are his journalism and his work product. And -- and again, what this is is the government seeking an order limiting his ability to publish materials -- this is different. We're not talking about the stuff the government is giving us that it collected from third parties. We're not talking about --

THE COURT: I know.

MR. RASCH: -- the --

THE COURT: We're -- we're --

MR. RASCH: We're not talking about the --

THE COURT: -- talking about --

MR. RASCH: -- we're talking about the stuff that --

THE COURT: This is stuff they got off --

MR. RASCH: -- was on his computer.
THE COURT: -- it during the search, I gather.
MR. RASCH: That's correct.
THE COURT: Okay.
MR. RASCH: And it's our position that -- number one, obviously it's our position that this was not obtained illegally, that it was obtained from a public web server, which all you need to do is put the address in.
But in the interim, what it means is --
THE COURT: You're talking about the IP address?
MR. RASCH: No. It -- there was an IP address, yes. You put that IP address into a browser, you see these videos.
THE COURT: Okay.
MR. RASCH: That's it. You don't need a user ID, a password, anything, just the web address. And I don't think the government contends that that's -- that -- that -- that -- that is not true. The government is simply saying he was not authorized to put that web address into a browser.
THE COURT: Okay.
MR. RASCH: That's how I read the indictment and the affidavit in support of the warrant, that these web addresses were secret because they weren't published.
THE COURT: Okay.
MR. RASCH: So the problem with that is that --

that they're -- Mr. Burke now can't -- some of this information may relate to things, like, the ***Smartmatic*** litigation to the -- the 2020 election and -- and -- and materials about what Fox knew and didn't know about their reporting. That's all these -- these types of materials.

This is stuff that may be -- may be newsworthy and worthy of publication that he hasn't had the ability to publish stories about for over a year and a half.

THE COURT: Why not?

MR. RASCH: Because the government won't -- won't give it to us except pursuant to a protective order.

THE COURT: Well, there wasn't even a protective order up to this point. There still isn't.

MR. RASCH: We didn't -- we haven't had it. They won't give it -- provide the discovery --

THE COURT: Oh, you haven't seen it?

MR. RASCH: -- unless we agree to a protective order.

THE COURT: You haven't seen it?

MR. RASCH: We have not.

THE COURT: He doesn't know what's in it?

MR. RASCH: There are thousands of vid- -- of such videos. We don't know what they are.

THE COURT: Okay.

MR. RASCH: And -- and for that, you know, again,

if the government has specific videos that it wants to enter a protective order, that's fine.

THE COURT: Okay. I've seen two videos --

MR. TREZEVANT: Yes, sir. I --

THE COURT: -- that are really insignificant. There was a video of a very attractive woman. I just wish she'd smiled some more and it'd been something better, but it was nothing.

And then there was another video that was hard to even discern what was going on. It was probably some nude show of some kind. You couldn't tell what was being said. So I looked at those things. So if they're all like that, we're all wasting our time because nothing is worthy of it.

MR. RASCH: No, this doesn't -- this is hundreds of hours of video.

THE COURT: Okay. Well, I -- I've seen two minutes of -- of it and if the rest is like that, you all are wasting your time. And so are you going to be introducing this stuff at trial?

MR. TREZEVANT: Your Honor, there are -- what the -- what is captured in the video streams -- first off, that's only one group of this. But anyway, what is captured in those video streams is essentially this defendant, Mr. Burke and the co-conspirator, using information that after hacking

into StreamCo, they stole information out of StreamCo, which they used to make -- to then intercept and -- illegally intercept the video streams. What they did was they figured out a way to monitor the cameras of broadcaster customers. They basically -- they were a fly on the wall. They were looking out of the cameras and listening.

So anyone that walked through that studio, had any conversation, had a meeting, discussed whatever was being recorded by Mr. Burke and Mr. Gaudino onto their systems. So that's what was going on. So they -- they basically were tapping into the cameras in broadcast customers' different -- different ones.

Now, the indictment mentions a Network 1 and a Network 2. There are other networks. There's even -- there's even a broadcaster -- a European broadcast customer that were all using the platform and these defendants -- and Mr. Burke and Mr. Gaudino were able to tap into their cameras and monitor their studios and they were intercepting all of their conversations and communications.

And so I -- I put a couple in just so that the Court could understand that that's just little segments from it, but there's thousands. Are we going to put in 1,000? Absolutely not, Judge. We're just going to put in the key ones that we need to prove that he was illegally intercepting the wire communications going on at the studios

and other places.

MR. RASCH: Just to assist the Court, I guess I'm trying to explain what these are. So when C-SPAN has a live camera, it's filming the House of Representatives, it's filming conference rooms, it's filming senate meetings, whatever else it is. It has a live feed and that live feed can either be public or private. If it's private, you have to hack something to get to that live feed. You have to get unauthorized access to the computer, break in, find the user ID, find the password, whatever else it is.

That is not what happened here. C-SPAN broadcasts live feeds in the clear, clear to any- -- and anyone can watch it if they have the appropriate web address. The government's allegation here --

THE COURT: You mean that's not the same as I get to see on my TV set?

MR. RASCH: No. The live feeds also include -- most of them are boring as --

THE COURT: I'm -- I'm in full agreement with that.

MR. RASCH: Not only stuff that goes on in Congress is boring, but this is like an empty conference room, a senate chamber. They are constantly broadcasting even when there's nothing going on. This is what we're talking about with the live feeds.

But occasionally, things that are interesting

happen. So, for example, at the State of the Union two years ago, three years ago, three years ago, when there was a confrontation between Utah Senator Mitt Romney and New York Representative --

MR. MADDUX: Santos.

MR. RASCH: -- Santos -- thank you -- and it almost went to blows, nobody picked up on that, but Mr. Burke was able to capture that live feed by going to the CNN live feed site where he then reported on it and it got picked up by all these newspapers. This is what a live feed is.

The question is whether or not the live feeds that Mr. Burke was viewing and which we're talking about here were obtained illegally. They were publicly accessible, internet addressable where all you need was the web address. You need no user ID, no password, and they were not encrypted.

The government's argument, at least I understand it based on the indictment, is that he did not have permission to go to these live feeds because they were confidential or secret. Mr. Burke did not create these feeds. He did not record anybody. He did not set up surreptitious microphones or cameras.

What he did was watch what is the equivalent of a CNN live feed by putting the web page in a browser and viewing it. That's the crime.

THE COURT: And then made it available to the

public.

MR. RASCH: He made some of --

THE COURT: Some of it.

MR. RASCH: -- available --

THE COURT: Some of it.

MR. RASCH: -- to the public, yes. Those are the crimes, collecting information and reporting on it.

MR. TREZEVANT: And that's not what's charged in the indictment, Judge.

THE COURT: What is charged?

MR. TREZEVANT: Is that he went -- is that Mr. Burke and Mr. Gaudino first hacked into the StreamCo platform. Once they were in the platform, they --

THE COURT: Well, was it both of them or just --

MR. TREZEVANT: Both of them.

THE COURT: -- the first guy?

MR. TREZEVANT: Both of them. Both of them went into it.

THE COURT: Okay.

MR. TREZEVANT: Repeatedly, repeatedly. And they kept going in time after -- they would repeatedly access it and they would steal out of that -- out of that platform the information necessary to ultimately cobble together the -- the -- the URL that they used to tap into the cameras. So these weren't publicly available. This is something where

they stole the information, using the stolen information, then they illegally intercepted the wire communications.

This is not like C-SPAN no matter what he says. That's not what's charged by the Grand Jury. And so what is charged by the Grand Jury are those videos. He never discusses the other.

What -- what is also charged by the Grand Jury is that they hacked into National Sports League's website --

THE COURT: I never even heard of the National Sports League.

MR. TREZEVANT: Well, it -- it -- it -- it -- that is an anonymized term for the actual sports league, but they -- they hacked into it and --

THE COURT: Oh, okay, okay.

MR. TREZEVANT: -- they stole 3,000 that were on Mr. Burke's system and we can show him downloading into the logs, tapped into that and just stole their files and he wants to say that's his reporting. That's not reporting. That's theft.

And when he -- and when he steals information from a platform that allows him to understand how to then intercept communications, those are not readily accessible to the public. He used stolen information to get them in the first place. That's what's charged in the indictment --

THE COURT: Now, I understand --

MR. TREZEVANT: -- and that's what's returned.
THE COURT: -- the first -- the first part of getting information to -- to get the username or the password, but there's a dispute about that, right?
MR. RASCH: Yes, your Honor.
MR. TREZEVANT: Not from our side, Judge. We don't think that has anything to do with anything.
As far as where he got the username and password?
THE COURT: So -- so you're contending Mr. Burke used both the username and a password that he obtained illegally?
MR. TREZEVANT: Correct.
MR. RASCH: And it's our contention that the username and password were published by the owner of the -- not from a hacker site, they published it on their own website, which is still available today. They published their own user ID and password on their website together with a link to the website to log into and noting that the user ID and password was case sensitive so you have to be careful when you type it in. So that's number one.
But number two, the government's theory here -- and obviously this is better for the suppression motion -- but it's relevant here because --
THE COURT: For a motion to dismiss.
MR. RASCH: For a motion to dismiss, right.

What's important here is even if -- even if you accept what the government says here today as being accurate, the government is arguing that Mr. Burke hacked into -- and by the way StreamCo is not a real name. There's an actual company.

THE COURT: Okay. And so the same thing when I got this -- misdirected by the sports league --

MR. RASCH: Right. The sports league is this -- it is a -- you know, all of these -- and this is our concern is that there is so much --

THE COURT: Well, the NBA was referred to on some of these.

MR. RASCH: It is the NBA.

THE COURT: Okay.

MR. RASCH: StreamCo is an entity called Live-View.tv. It runs a commercial service that streams video. All right? It is available to thousands of broadcasters and to journalists and others.

What the government is alleging is that Mr. Burke used this user ID and password, which at least it was publicly available. Whether that's authorization or not, that's for a trial. He then logs in there and obtains a list of URLs of web pages which required nothing else but them to put that web page in a browser. It is not a question of authorization under 2511.

The question is one of the elements of the crime is that the service, in this case Live-View service, has to be configured -- has to not be configured to be readily accessible to the public. Even if they misconfigured it, even if they did something wrong, it's configured to be accessible to the public.

All Mr. Burke is alleged to have done is put that web page address, which the government says he obtained illegally, which we contend he did not, into a browser and viewed the files. That is not a violation of 2511 because he -- because the server was configured to be accessible to the public and, therefore, he intercepted nothing illegally.

THE COURT: Okay.

MR. RASCH: Now, obviously that's for a different motion.

THE COURT: Right.

MR. RASCH: But the results of that, which we contend are exactly the same as the C-SPAN files, you put an address in a browser, you view it, not hacking, that's why the government wants a protective order, to prevent Mr. Burke from reporting on and that's what we contend -- and -- and these are unguarded communications.

THE COURT: At this point isn't all that stuff stale?

MR. RASCH: We don't know. It may end up being that he looks at it and says, no, this is newsworthy.

THE COURT: My notion is we're talking about stuff that's really not significant. All this stuff is -- is stale. It's not newsworthy. Nobody wants to watch it.

MR. RASCH: That's not entirely correct. One of the videos that was -- was -- that was reported on relates to Tucker Carlson having a conversation the day he was deposed in the ***Smartmatic*** litigation.

In the ***Smartmatic*** litigation, which arose out of allegations that Fox News deliberately falsely reported that ***Smartmatic*** was involved in voter fraud and all of that. There were unguarded conversations between Fox News executives about whether -- what they knew -- whether they knew what they were reporting was --

THE COURT: Okay.

MR. RASCH: -- correct or not. That litigation, part of which is still proceeding, these are -- all of these are unguarded communications.

THE COURT: Well, it's good gossip so I understand it might still be somewhat newsworthy.

MR. RASCH: And it -- and it relates to election integrity and Fox News is reporting about election integrity. The -- the stories that got Mr. Burke into trouble were when he reported that Fox News was deliberately concealing

information about Kanye West's racism and anti-Semitism and bizarre comments because he had the full interview. That was what this case was about. He recorded the full interview of something that Fox News wanted to conceal. Fox News conducted an investigation. They had a forensic investigation and they turned it over to the government. The government turned it into a search warrant and seized Mr. Burke's reporting.

All he wants is the ability -- I'm not saying whether or not he will exercise it -- the ability to report on content he believes is newsworthy without seeking permission of the Court or the government before he publishes.

THE COURT: Okay. Is there anything you want to say to that?

MR. TREZEVANT: Well --

THE COURT: Because that's a different category entirely than the first two. The first two are sort of easy.

MR. TREZEVANT: This -- the way defense counsel has explained the case has nothing to do with the actual charges and the indictment as returned by the Grand Jury. The charges as returned by the Grand Jury are that Mr. Burke and Mr. Gaudino hacked into --

THE COURT: Okay. But Gaudino sort of came along later.

MR. TREZEVANT: Right. They stole -- and that

they stole the information and using the stolen information, they illegally intercepted all of these wire communications. Now, what he says is in the wire communications, I'm not sure about that, but -- but they are illegally intercepted wire communications. They are the fruits of the crime as charged by the Grand Jury. They are on the items that are listed in the forfeiture allegations. So those video streams that were illegally -- they're charged in the indictment as illegally intercepted and all the files stolen from the NBA and other places are --

THE COURT: These are some videos in the past that are reviewed -- I mean, comments on games in the past?

MR. RASCH: Say that one more time, Judge.

THE COURT: The -- the NBA stuff, that's commentary or portions of some games?

MR. TREZEVANT: It's sports videos and all sorts of stuff. It's just downloaded en masse by --

THE COURT: Who wants to see that --

MR. TREZEVANT: -- this defendant.

THE COURT: -- stuff at this point?

MR. TREZEVANT: I -- I don't know, Judge. I just know that the NBA or any other sports league doesn't want all their files just downloaded -- hacked into and downloaded, which is what -- what they're charged with in the case. It's just going into other people's computers and stealing

their stuff. It's stealing the -- the property of these sports leagues. You can't do that obviously. And so that's not his --

THE COURT: But at this point, who cares?

MR. TREZEVANT: The -- the -- the companies from which it was stolen.

THE COURT: So --

MR. TREZEVANT: They don't want their copyrighted stuff just stolen.

THE COURT: So is it Fox Sports?

MR. TREZEVANT: No. That -- I think he's talking about the NBA.

THE COURT: Okay. The NBA.

MR. TREZEVANT: Yeah. They don't -- that -- that's their property. That's theirs. They want to protect their property. They don't want it stolen and distributed, that's right.

MR. RASCH: And -- and, your Honor, at this time --

MR. TREZEVANT: And it's theirs. It's their property. So some of it is product they're creating, working on. They put it in these servers and they work on it and --

THE COURT: Not at this point they're not.

MR. TREZEVANT: Well, it's still theirs. And so because of that, Judge, they -- they have an interest in their own property.

THE COURT: Well, yeah, they always do. And it's the -- I'll go back to the company is always saying everything we have is the most confidential thing ever that came across. So there's this exaggeration on the part of the companies that everything is so important and it isn't. I can't imagine -- maybe if they had Caitlin Clark in the game or something like that, but --

MR. TREZEVANT: Well, it's all sorts of different property.

THE COURT: -- the NBA stuff from a couple years ago nobody cares about.

MR. RASCH: And -- and, your Honor, some of this stuff --

THE COURT: People only care about now.

MR. RASCH: -- is --

MR. TREZEVANT: Companies -- companies like --

(Simultaneous cross-talk making testimony unintelligible.)

THE COURT: I know they're always sensitive. You're right. They're very sensitive to have their stuff shown.

MR. TREZEVANT: And stolen and --

THE COURT: And that sensitivity is overblown because it wouldn't make a difference. If -- if --

MR. TREZEVANT: But regardless --

THE COURT: -- Mr. --

MR. TREZEVANT: But -- but regardless, I'll tell you it's worth very little, Judge, to -- if he hacks in and steals it, it's still the fruits of his criminal conduct.

THE COURT: And I'm saying you could prosecute him for doing that. That's like stealing -- I mean, I had a guilty plea with some guy who was a Brinks truck driver this morning who was handling ATMs and he took some of the money. Okay. They're going to get the money back, but he still committed the offense. So the -- the fact that --

MR. TREZEVANT: And -- right. So the defendant was charged with stealing and --

THE COURT: Yeah. I mean, I'm not saying they can't charge him for doing what he did, whatever it is, because it's not clear to me any longer. Whatever he did, he can be prosecuted for it.

But now the suggestion is that the protective order needs to be entered in order to prevent him from disclosing this stuff that nobody wants to see.

MR. TREZEVANT: Well, like I said, Judge, he stole it, Judge. It's stolen.

THE COURT: I understand. I -- I understand. And so -- but it's stuff that nobody cares about.

MR. TREZEVANT: Well, but the companies care.

THE COURT: I know it, and that's my point. The

companies always care. They -- they are excessive in their concern about something happening such --

MR. TREZEVANT: And so am I.

THE COURT: -- that they will lose their copyright or something like that. They're worried about it.

MR. TREZEVANT: And so when a defendant illegally enters or hacks into a server and steals stuff, that defendant has no right or interest in that property to use it or publish it or anything. That -- that -- that -- what you're saying, the fruits of the crime --

THE COURT: Okay.

MR. TREZEVANT: -- should not be his to do with what he wants. You don't get to benefit by stealing. That's just not the way it works.

THE COURT: Okay. All right.

MR. TREZEVANT: You know, it's like a bank. You can't steal from a bank and say now I've got the money and I'd like to spend it. You can't do that. That's still -- the -- the -- the fruits of his crime. So when he illegally goes into --

THE COURT: But the problem is we're talking about this huge amount of information that may or may not be worthy of publication and you want to prevent him from publishing all of that stuff?

MR. TREZEVANT: Whatever he stole, right. Whatever

he stole, he can't publish, that's correct.

THE COURT: No matter how insignificant, no matter how stale, no matter what?

MR. TREZEVANT: If he stole it?

THE COURT: Yeah.

MR. TREZEVANT: If it's the fruits of his crime, he should not be allowed to publish it.

THE COURT: Okay. What do you say to that?

MR. RASCH: Two things. First of all, this is not a theft offense. He's being charged with an interception offense, number one.

Number two, the -- the indictment and the affidavit for a search warrant are missing key elements, which we'll discuss later.

THE COURT: Well, that's a different issue.

MR. RASCH: But -- but they don't allege that -- that it was obtained from a server that was not configured to be accessible to the public. So essentially, they're charging him with watching television.

THE COURT: But that's not the issue any longer.

His point is, hey, he stole this stuff, he shouldn't be permitted to publish it because he has no right to have it in the first place.

MR. RASCH: Well, also 18 USC 2511 is not a theft offense. It's not -- it's not a possessory offense or

a theft offense.

THE COURT: But that's -- the point is that that's how he got it.

MR. TREZEVANT: In other words, your Honor, it --

THE COURT: And you shouldn't have it.

MR. TREZEVANT: If he -- if he illegally wiretaps somebody having a conversation and it's a boring conversation, that doesn't mean that he gets to publish it because it's boring. It's still an illegal interception and it's fruits of that crime and he should not have the ability to publish that simply because somebody finds it boring or not material. That's not up to him. You can't steal it and use the fruits of your crime.

MR. RASCH: It -- it's not stolen.

THE COURT: Okay. Yeah, but here's the -- the catch is --

MR. TREZEVANT: The communication.

THE COURT: But he had it and the government came and got it by a search warrant.

MR. TREZEVANT: Correct. He had the fruits of the crime at his house, there was a search warrant and it was seized.

MR. RASCH: An analogy would be --

THE COURT: And there's a winkle there.

MR. RASCH: A police officer -- if a person

encounters a police officer on the -- on the street and the police officer illegally arrests him or whatever else it is, the police officer says I never consented to you recording my communications, or whatever it is. Florida is a multi- -- an all party consent state. The police officer engaged in this conduct. The person wants to report this to the pub- -- they want to put up a YouTube video showing the police are engaging in this conduct.

The police officer would have the ability to then seize the video as evidence of the illegal wiretapping and prevent them from being disseminated because it was illegally made. And even though he knows it's in public and it's under circumstances where it's in public, he could go in, get a warrant, seize that by leaving out the fact that it was in public, just omitting that, get the warrant and --

THE COURT: You're doing a hypothetical that leaves out an important factor. So --

MR. TREZEVANT: It's got nothing to do with this case.

THE COURT: Yeah. We're not going there.

But we sort of come down to the first two categories, I don't have any problem with.

The third category, now we've raised this issue --

MR. TREZEVANT: Which issue, Judge?

THE COURT: The issue of, hey, that he shouldn't have it in the first place and, therefore, he couldn't publish -- he can't publish it.

MR. TREZEVANT: Publish what he stole, yes, sir, that's -- that's our position.

THE COURT: Yeah.

MR. TREZEVANT: Or -- or what he stole or illegally intercepted, that's right, an illegal wire.

THE COURT: Yeah. You've got a wiretap in there, that's right. Okay.

MR. TREZEVANT: So if you -- our theory is if you illegally --

THE COURT: Well, that sort of -- this sort of has come around full circle because you guys didn't focus on this particular aspect of it, which I find interesting. So --

MR. TREZEVANT: Not to interrupt, Judge, but I do believe we -- we addressed in our -- in our filing.

THE COURT: Okay. You don't want to file anything further on it?

MR. TREZEVANT: I mean, I'm happy to file more on it, Judge, but we did address --

THE COURT: I'm now focused on he illegally obtained something that the government has now seized and he wants to see it and he also wants to publish it.

MR. TREZEVANT: Yeah. We have no objection with him seeing it.

THE COURT: I understand that.

MR. TREZEVANT: We have objection to him publishing --

THE COURT: Yeah. I'm not sure that your memos focus on that little nicety.

MR. RASCH: And by the way, he may want to publish it, he may not want to publish it. He wants the ability to -- to make that choice.

I suggest your Honor --

THE COURT: So wait a minute. Okay. So if I say, well, let's get some further memoranda on that particular issue, is it worth your time if he doesn't want to publish it?

MR. RASCH: No, he doesn't know until he sees it whether there's anything worth publishing on there. The real question here is, yes, I think it's absolutely worth what --

THE COURT: He can see whenever he wants to. The government will show it to him.

MR. RASCH: Well, I think, your Honor, the -- the right thing to do is to -- to -- we would be happy to prepare a memorandum on that and it would only take us a few days to do so and we would enter -- if it would assist the Court, we

would be happy to do that.

Our -- our other concern is that it's pushing -- it may push the other July 1st date back a few weeks.

THE COURT: No, it shouldn't affect that whatsoever.

MR. RASCH: Okay.

THE COURT: I mean, that -- those are the dates that you're -- that you're bound by and -- is it still Judge Barber that's overseeing this case?

MR. TREZEVANT: I believe so, Judge.

MR. MADDUX: It's Judge Mizelle.

MR. RASCH: Mizelle.

MR. TREZEVANT: But I think that --

THE COURT: No. She just had a baby.

MR. TREZEVANT: For now, for now, yes, Judge.

MR. MADDUX: But it's -- your Honor, if I could speak, I was at status. She set the date for July 1. I am expecting to possibly ask -- and we haven't had a chance to speak with Mr. Trezevant -- about extending that date briefly because there are a number of issues, but she set the date. She also set a date certain for trial for October 21st and was expecting that she would be back to adjudicate that case.

THE COURT: Well, I'd expect, though, that she'd be back by October.

MR. MADDUX: Yes. And so that's --

THE COURT: But I'm not sure if she'll be back

by -- by July 1st or whatever the day is. She just had a baby.

MR. MADDUX: That, I honestly did not know.

THE COURT: You know, that's --

MR. MADDUX: I was just trying to explain that it would be Judge Mizelle that we would petition, or Judge Barber in her absence --

THE COURT: Yeah.

MR. MADDUX: -- because he's covering her docket, which I did understand.

THE COURT: Yeah.

MR. TREZEVANT: And so, Judge, are you asking that we -- that we would provide additional briefing on whether defendant can use the fruits of his criminal -- his charged criminal conduct?

THE COURT: Well, it's -- it's more narrow than that. He -- we'll assume he wants to publish this stuff.

MR. TREZEVANT: But publish -- publish the fruits of the charged conduct?

THE COURT: Yes. So -- and it's gotten much more focused than it was. We were scrambling all over the place and now I'm prepared to get some memo on that particular narrow issue of whether a defendant who obtains -- and I'm not -- this is not the way to state it. I'm just saying the issue is raised, hey, the government says he

stole it, whether he used that term or not, I don't care. He stole this and he should not have a right to publish it. That's sort of the bottom line.

MR. RASCH: Yes, your Honor.

THE COURT: And so we'll see where we go from there. But, okay, how much time do you want? I mean --

MR. TREZEVANT: I'm -- I'm not sure what the Court is --

THE COURT: Because this has nothing to do with the deadlines for filing --

MR. TREZEVANT: No, I understand that, Judge.

THE COURT: -- a motion to dismiss or a motion for -- to suppress.

MR. TREZEVANT: Right. They've had access to all the information, they can file. That -- that's a different issue.

But as far as the -- this -- is the Court going to set a page on all of this or --

THE COURT: A what?

MR. TREZEVANT: A page limit or -- I'm trying to get an understanding of the confines of the -- what the Court is thinking.

THE COURT: Okay. I'm just -- I'm just -- this is just a supplement of memos that we already have. That's all. We're dancing all around. The first two categories,

I'm -- I'm fine with. I'm going -- but with the understanding you can make objections to anything in particular, but -- but the first two categories, I don't see an issue.

The second cate- -- the third category, the government has raised the issue, hey, he stole it or whatever the term is.

MR. TREZEVANT: Or illegally intercepted it, yes, sir.

THE COURT: Well, whatever. And, therefore, he should not have the right to publish it. So -- and then that has not been the focus of what was previously submitted so I'm prepared to take memos on that because there might be some case right on point for all I know.

MR. TREZEVANT: Do you have a sense to the length of that, Judge?

THE COURT: Pardon?

MR. TREZEVANT: Do you have the sense of how many pages --

THE COURT: How many pages?

MR. TREZEVANT: Yeah. I'm trying to understand, like, if the Court wants to know, like, how long it would take to -- to provide the extra briefing. I was just wondering if the Court had sort of --

THE COURT: Yeah. Well, I don't -- I surely don't want more than 20 pages because if you -- if there's just

a few cases on it, then it shouldn't take more than 20 pages. So the standard is 20 pages and it has nothing to do with the time deadlines for the other issues.

And the reason I'm smiling is because I did get a message from Judge Mizelle indicating she's enjoying snuggling with her new baby. So she isn't going to come racing back. But --

MR. TREZEVANT: Ten days, Judge?

THE COURT: No, because that's probably a Monday -- a Sunday. So we'll do -- I don't care. I mean --

MR. TREZEVANT: Fourteen days?

THE COURT: Now, next week is the 4th of July week. The Court is closed on 4th of July and Judge Corrigan has closed the Court on the 5th. So -- so go to the following Monday --

MR. TREZEVANT: All right.

THE COURT: -- which would be July 8th. How about that?

MR. RASCH: Your Honor, may I suggest, it's actually the government's motion to prevent Mr. Burke from publishing stolen materials. So I suggest that we just be given a few days after the government files. Otherwise, if we're filing simultaneously and we can't address each other's arguments. But I'm amenable to whatever the Court wants.

THE COURT: Yeah. Well, let's just move it

along. I just want to know if there are some cases out there that are right on point.

MR. TREZEVANT: Yes, Judge, your Honor.

THE COURT: I don't want prior -- the same cases. I don't want all kinds of other stuff. I'm just wondering if there's any case that's sort of right on point that the government has raised and so we'll make it simultaneous submissions.

I'm going to do it the 9th so that if you go off on a holiday, you can enjoy yourself. That's a Tuesday. Okay. So simultaneous submissions on July 9th focused on that specific assertion that the government has raised, that because Mr. Burke has stolen stuff, and I'm using that term --

MR. TREZEVANT: I understand.

THE COURT: -- that he should not be permitted to use it in terms of publication. He can see it and so on.

Okay. Anything further we need to address then?

So with respect to the protective order, do you want a protective order that covers the first two categories at this point or not? It doesn't make any difference.

MR. TREZEVANT: It -- it seems like it would be better to wait and do one protective order.

THE COURT: All right. Okay. That's fine with me.

So you've heard what I said. You understand that you can make objections?

MR. RASCH: As a practical matter, we are -- we are going to treat the materials in yellow as the stuff that is presumptively --

THE COURT: Okay.

MR. RASCH: -- what they want to have covered by the protective order.

THE COURT: That's fair. That's fair. But if it's identified, to me, it can't be just the stuff that's --

MR. RASCH: Understood, understood.

THE COURT: -- as to whatever kind of Bates number is there.

All right. Anything further we need to address?

MR. TREZEVANT: Not from the government, your Honor.

THE COURT: Okay.

MR. RASCH: Not for Mr. Burke, your Honor.

THE COURT: All right. The Court will be in recess.

COURT SECURITY OFFICER: All rise.

(Whereupon, the Court adjourned at 3:59 p.m.)

--oo0oo--

UNITED STATES DISTRICT COURT )
)
MIDDLE DISTRICT OF FLORIDA )

REPORTER TRANSCRIPT CERTIFICATE

I, LORI ANN CECIL VOLLMER, Official Court Reporter for the United States District Court, Middle District of Florida, certify pursuant to Section 753, Title 28, United States Code, that the foregoing transcript is a true and correct transcription of the stenographic notes taken by the undersigned in the above-entitled matter, Pages 1 through 75, and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States of America.

I further certify that I am not attorney for, nor employed by, nor related to any of the parties or attorneys to this action, nor financially interested in this action.

IN WITNESS WHEREOF, I have set my hand at Tampa, Florida, this 6th day of May 2026.

/s/ Lori Ann Cecil Vollmer

Lori Ann Cecil Vollmer, CSR, RPR
United States Court Reporter